(No. 6652.   July 11, 1939.)

SOL CALDWELL and FRED CALDWELL, Executors of
the Estate of MARIA CALDWELL, Deceased. Appel-
lants and Cross-respondents, v. HENRY THIESSEN,
Respondent and Cross-appellant, and FRANZ WASSEM,
Respondent.

[92 Pac. (2d) 1047.]

Cox, Ware & Stellmon and Leo McCarty, for Appellants and Cross-respondents.

Butler & Madden, for Respondents and Cross-appellant.

GIVENS, J.—October 23, 1934, Wassem, mortgagee of a chattel mortgage given by Thiessen, his brother-in-law, as mortgagor, purchased at foreclosure sale thereof the cattle

covered thereby. October 24, 1934, Thiessen and Wassem entered into a contract whereby Thiessen was to feed and care for said cattle, the net return derived therefrom to be divided 20 per cent to Wassem and 80 per cent to Thiessen, an accounting to be made from time to time, termination to be upon 90 days notice in writing from one to the other at the end of any year.

June 11, 1935, appellants were issued a sheriff's certificate of sale under a foreclosure of a real estate mortgage against Thiessen, and June 10, 1936, appellants sued cross-appellant Thiessen as "tenant" and respondent Wassem as owner of the cattle fed upon the land, under section 8–407, I. C. A., for $1,919.52 alleged to be the value of the use and occupation of the real estate foreclosed in the proceedings above mentioned.

Wassem denied he was owner of the cattle during the period of redemption, contending the joint written contract had been terminated and a subsequent oral agreement entered into prior to June 11, 1935, under which the cattle were sold by Wassem to Thiessen for $7,500, and that July 17, 1935, Thiessen made final payment thereon.

The trial court dismissed the action against Wassem and gave judgment for $1,554.81 against Thiessen. The Caldwells appeal from the entire judgment and Thiessen cross-appeals from the judgment against him.

The two points at issue are: First, whether a mortgagor remaining in possession after foreclosure sale and issuance of sheriff's certificate thereof during the period of redemption is liable to pay for the use and occupation of the land; appellants contending the word "tenant" in section 8–407, I. C. A., *supra,* so covers the mortgagor in possession, respondents urging the contrary.

California in 1859 (*Harris v. Reynolds,* 13 Cal. 514, 73 Am. Dec. 600) under a statute identical with ours, held that during the year's period of redemption the mortgagor must pay the purchaser as owner of the land for the use and occupancy thereof. The only case squarely to the contrary is *Local Realty Co. v. Lindquist,* 96 Utah, 297, 85 Pac. (2d) 770. The California holding is the only logical one for this

reason: After the sale the title to the land is in the purchaser (*Northwestern & Pacific Hypotheekbank v. Nord,* 56 Ida. 86, 50 Pac. (2d) 4; *Sherwood v. Daly,* 58 Ida. 744, 78 Pac. (2d) 357) and he is entitled, therefore, to receive compensation for its use. If redemption is made no new title is created but the mortgagor's title is merely revived (*Northwestern & Pacific Hypotheekbank v. Nord, supra*) and in that event the statute gives him all that he is entitled to by providing that rents paid shall be applied on the redemption. (Sec. 8–407, I. C. A., *supra*; *Smith v. Howell,* 91 Or. 279, 176 Pac. 805; *Reichert v. Sooy-Smith,* 85 Or. 251, 165 Pac. 1174; *Fields v. Crowley,* 71 Or. 141, 142 Pac. 360; *Citizens' Nat. Bank v. Western Loan & Building Co.,* 64 Mont. 40, 208 Pac. 893; *Mortgage Investment Co. v. Taylor,* 49 Ariz. 558, 58 Pac. (2d) 340; *Great Northern State Bank v. Lindvold,* 57 N. D. 610, 223 N. W. 345.)

■■ If no redemption is made the value of the use and occupation must follow the holder of the legal title, namely, the purchaser. It is axiomatic that a statute adopted from another state will be given the construction and meaning given it by the courts of that state prior to our adoption of it unless such construction is clearly unreasonable. (*State v. Taylor,* 59 Ida. 724, 87 Pac. (2d) 454, and cases therein cited.)

■■ Webster's New International Dictionary (1935) defines the word "tenant" as "one who holds or possesses real estate, or sometimes personalty, by any kind of right, whether in fee simple, in common, in severalty, for life, for years, or at will; also one who has the occupation or temporary possession of lands or tenements the title of which is in another," and Funk & Wagnalls New Standard Dictionary (1937) thus: "one who holds or possesses lands or tenements by any kind of title; in a more restricted sense one who holds of or under another." The word "tenant" as used in section 8–407, I. C. A., *supra,* was thus used in its generic sense, and a mortgagor holding over during the period of redemption is a "tenant in possession" within the meaning of the statute. (*Harris v. Reynolds, supra; Geo. B. Clifford & Co. v. Henry,* 40 N. D. 604, 169 N. W. 508; *Citizens' Nat. Bank v. Western*

*Loan & Building Co., supra; Walker v. McCusker,* 71 Cal. 594, 12 Pac. 723; 62 C. J. 571, Tenant, sec. 1.)

The above analysis and construction of the statute and the relative rights of the parties is not unreasonable and therefore the California rule is properly followed and the trial court was correct in giving judgment to appellants for the value of the use and occupancy of the real estate involved, and while there is evidence the rental value of the land was considerably more than the judgment of $1,554.81, there is ample evidence sustaining the judgment in at least this amount, and though there is a conflict, the usual rule prevails.

The other point is whether or not the evidence is sufficient to show a termination of the written contract of October 24, 1934, whereby Wassem, after such termination, had no such interest in the cattle as to be equally liable for their keep on the land during the period of redemption. Aside from the testimony hereinafter detailed which would tend to show a continuation of the written agreement, there are these pertinent facts: Wassem foreclosed his chattel mortgage on the cattle October 23, 1934, and as above mentioned, on October 24th made the written agreement with Thiessen for their keep. Some time thereafter, claimed by him to have been prior to June 11, 1935, though not definitely fixed, he assertedly resold to Thiessen the cattle upon which he had previously had a mortgage, but took no note, mortgage or other security to secure him for the new purchase price. December 22, 1934, Thiessen filed a petition in bankruptcy under Title 11, U. S. C., sections 202 and 203, being amendments to the general provisions providing for agricultural compositions, commonly referred to as the Frazier-Lemke Act. In his schedule of assets filed with the petition for bankruptcy, under the heading "Personal Property," Schedule "F," Thiessen stated:

"Contract for care of 195 head of cattle and their increase, 80 per cent of increase as compensation."

Wassem filed no claim in said bankruptcy proceedings.

The cattle were sold at auction in Spokane March, 1936. During 1935 and 1936 the cattle were returned to the assessor of Nez Perce county as the personal property of Wassem on

a statement issued to Wassem as taxpayer and signed "J. F. Wassem by Henry Thiessen." Just prior to taking the cattle to Spokane to sell them the county assessor of Nez Perce county demanded the taxes be paid on them before their removal from the county and Wassem paid these taxes.

Evidently because of objections and protests filed by appellants and after Thiessen had been unable to effect a conciliation, and after he had petitioned that he be declared a general bankrupt, the federal district court vacated the previous orders and dismissed Thiessen's entire bankruptcy proceedings June 6, 1935.

The testimony of Wassem and Thiessen concerning the termination of the written agreement of October 24, 1934, and the making of the oral agreement of sale in place thereof is as follows:

THIESSEN, on cross-examination:

"Q. Now the increase (from the cattle) was owned by you and Mr. Wassem?

"A. After he was paid, the increase belonged to me.

"Q. Yes, but before that the increase belonged both to you and Mr. Wassem?

"A. Not after we made the agreement to pay him for the cattle?

"Q. Yes, but under your contract, Mr. Thiessen?

"A. We done that right shortly after we made the contract. We come to the other agreement.

"Q. What was the other agreement?

"A. We paid him for the cattle. He was satisfied if he got his money out of it.

"Q. Now, before you made that arrangement, Mr. Thiessen, if one of the increase of the herd died the loss fell on both you and Mr. Wassem, didn't it?

. . . . . . . . . . . .

"THE COURT: I understood the witness to state that they immediately made another agreement.

"Mr. COX: He said a short time afterward.

"THE WITNESS: Yes, I said we did."

THIESSEN, on recross-examination:

"Q. Mr. Thiessen, you had a written agreement such as you testified about with Mr. Wassem that was made in 1934, didn't you?

"A. Yes.

"Q. Now, how long after that written agreement was it before you made an oral agreement with him such as you have testified to?

"A. Oh, I should judge a month, month and a half, maybe.

"Q. And where were you when you made the oral agreement?

"A. Right at home.

"Q. And who was present when you made it, Mr. Thiessen?

"A. Well, Mr. Cox, I didn't make no note of it but transacting business and making a deal, that is all.

"Q. Do you remember who was present?

"A. Mr. Wassem was I expect."

WASSEM, direct examination:

"Q. How long did that contract remain in effect?

"A. It was made out for one year, I think.

"Q. How long did you actually operate under it?

"A. Oh, about—about eight months, seven or eight months. Until I got my money out of it.

"Q. How is that?

"A. Until I got my money.

"Q. When did you get your money out?

"A. I got my money July the 17th, 1935.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Were those payments made under an understanding between you and Mr. Thiessen that if he could sell enough cattle to pay you enough, what you had in it, that then you would turn the rest of the cattle over to him?

"A. Yes, sir.

"Mr. COX: Wait a minute. We move to strike the answer. We wish to make an objection.

"THE COURT: State your objection.

"Mr. COX: We object to it on the ground it is incompetent, irrelevent and immaterial and further upon the ground that it is leading. Counsel has stated the arrangement and all the witness did was say yes.

"THE COURT: Yes, it is as leading as can be.

"Mr. BUTLER: Q. When you accepted the payment from Mr. Thiessen, did you do that under a new understanding and agreement different than this contract?

"A. I said as soon as he gets it all paid off, interest and everything, I turned the rest over to him.

"Q. And you were finally paid in July, 1935 and then you carried out your part of that agreement?

"A. Yes."

WASSEM, cross-examination:

"Q. When did you make this oral agreement with Mr. Thiessen that you speak of?

"A. I don't know. It was after—after we foreclosed.

"THE COURT: After what? I cannot hear what you said.

"A. At the time he made the first payment.

"Q. Well, when did he make the first payment?

"A. In February.

"Q. February, 1935?

"A. Yes.

"Q. But you must have had an agreement before he made the payment?

"A. Well, it was around that time.

"Q. Well, when did you make the agreement?

"A. I don't remember.

"Q. And where did you make the agreement?

"A. At my place.

"Q. It was not out at his place?

"A. Well, I don't know for sure whether it was on our place or on his place.

"Q. Now, Mr. Wassem, you knew about Mr. Thiessen's bankruptcy proceeding?

"A. I do not understand.

"Q. Yes, you can understand that. Did you file a claim as a creditor in Mr. Thiessen's bankruptcy proceeding?

"A. I just foreclosed because I wanted my money for the cattle?

"Q. Did you file a claim in the bankruptcy proceeding?

"Mr. MADDEN: Explain, Mr. Cox, what that claim in bankruptcy amounts to, what it is.

"Mr. COX: Q. Well, it amounts to a written statement under oath that Mr. Thiessen owes you a certain amount of money. Did you file such a document in the bankruptcy proceedings?

"A. I won't answer. I do not know.

"Q. You do not know whether you did or not?

"A. No.

"Q. Don't you know you did not?

"A. I do not understand.

"Q. Oh, you do not understand the question?

"A. No.

"Q. All right, we will try to make that plain to you. Now in bankruptcy, Mr. Wassem, a creditor who wants to get his money or whatever is recoverable fills out a printed form of claim stating that the debtor, the bankrupt, owes him a certain amount of money and what it is for and if it is evidenced by a note he attaches the note and then that is filed in the court where the bankrupt is situated. Now you know whether such a paper was filed.

"Mr. BUTLER: If the court please, explain to him this was not a formal bankruptcy; it was under the Frazier-Lemke.

"Mr. COX: You have to file a claim just the same.

"Mr. BUTLER: Not until the man is adjudged a bankrupt.

"Mr. COX: This man was adjudged a bankrupt in 1934.

"Mr. BUTLER: Not under formal bankruptcy.

"Mr. COX: I do not have to explain the whole code to him.

"Q. Did you sign and file any paper in Mr. Thiessen's bankruptcy?

"A. I do not know. I do. not know anything about that.

"Q. You know whether you signed and filed a paper, don't you?

"A. John Cramer, the lawyer, was doing my work. I do not know what he did.

"Q. You know what he did. He couldn't do this for you, you would have to do it.

"Mr. BUTLER: I challenge the question.

"Q. Mr. COX: Did you swear to any claim and file it in that proceeding?

"A. I told you I didn't know. I don't know what you mean.

"Q. You don't know what we mean?

"A. No, sir.

"Q. Do you know what signing your name means?

"A. Sure.

"Q. Sure.

"Q. And do you know what taking an oath means?

"A. Yes.

"Q. Now, did you sign your name to a paper and then take an oath it was true and then file it in that bankruptcy proceeding? Now you know what that means, don't you?

"A. I don't know whether I did or not.

"Q. Cannot tell whether you did or not?

"A. No.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Yes. I am talking about the contract. You terminated that, didn't you?

"A. I don't know what you mean.

"Q. What?

"A. I don't know what you mean.

"Q. Terminated it, didn't you, canceled it?

"A. Canceled it after I got the money.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. You believed that when the cattle were sold and the mortgage was canceled off that the mortgage was still good?

"A. I still had a share of the cattle.

"Q. I am sure you had a share of the cattle. However, when you reached another agreement, a purely verbal agreement by which Mr. Thiessen became your debtor in the sum of some of seventy-two hundred dollars, you did not take any writing on it whatsoever, did you?

"A. No, sir."

THIESSEN, recross-examination:

"Q. Mr. Thiessen, at the time you filed your petition in bankruptcy you say that you had made a different arrangement with Mr. Wassem, under which you became his debtor and owed him about seventy-two hundred dollars?

"A. Yes.

"Q. Now, then, did you list Mr. Wassem as one of your creditors in that proceeding?

"A. In bankruptcy?

"Q. Yes.

"A. No.

"Q. You did not list him as a creditor?

"A. No. I do not think so. I didn't owe him anything then, he had got the cattle foreclosed.

"Q. Oh, yes.

"A. *The cattle were his.*

"Q. Oh, no, you had made this contract before that, this written contract.

"A. Before that?

"Q. Before the bankruptcy.

"A. I do not think so.

"Q. Oh, yes. The contract is dated in October, 1934 and you were adjudged a bankrupt on the 4th day of 1935—the 4th day of February, 1935.

"A. Then I want to get the question.

"Q. So you were adjudged a bankrupt after you made this contract with Mr. Wassem. Now you began paying him money about the time you were adjudged a bankrupt, so you had made an agreement prior to that time to terminate this written contract, and by that agreement you became his debtor in the sum of about seventy-two hundred dollars, didn't you?

"Mr. MADDEN: If the court please, I challenge the statement. He did not make any such statement. Mr. Wassem testified that he held the contract until it was paid.

"Mr. COX: Mr. Wassem testified he made an agreement with Mr. Thiessen.

"Mr. MADDEN: Well, the evidence is in on that too, *there was no agreement.*

.   .   .   .   .   .   .   .   .   .   .   .

"Q. When you began making payments to him, you had already reached an agreement with him if you paid him the seventy-two hundred dollars you could have the cattle, didn't you?

"A. When we agreed—or rather he agreed when I paid for the cattle—no matter how many cattle I sell they are

his cattle and I sell them—as soon as he got his money in the cattle the remaining cattle would be mine, and that is all the agreement and I am not ashamed to tell it.

. . . . . . . . . . . . . .

"Q. What? Why, if you made that agreement with Mr. Wassem, you owned them as far as that is concerned, gradually paying off the debt, didn't you?

"A. Not at that time.

"Q. Well, if you didn't own them at that time, you did own an interest in them under this contract, didn't you, the written contract?

"A. Yes, if I raised any payments.

. . . . . . . . . . . . . .

"Q. I am just trying to find out. You made a payment along the first of February, so Mr. Wassem testified, then you must have had an agreement that you would buy the cattle back for seventy-two hundred dollars before you made that payment to Mr. Wassem, didn't you?

"A. I don't remember. I am answering now I don't remember, but I know well enough if them cattle was tied in the other I wouldn't have sold them. How could I sell them?

"Q. Was tied up in what way?

"A. What you are trying to ask me into.

"Q. I am not trying to ask you into anything. I am just trying to get you to tell how things were.

"A. I cannot understand you and I cannot remember."

Conceding every intendment in favor of the finding of the trial court to the effect that Wassem had no interest in the cattle during the period of redemption and recognizing that the trial judge had the advantage of hearing the witness testify, this evidence is not only insufficient to support said finding but there are positive declarations, as noted in the testimony above, that Wassem did have an interest in the cattle after the foreclosure of the chattel mortgage, October 23, 1934, and the new agreement and its claimed termination. There is no dispute that some 15 head of bulls were kept on the land involved herein for approximately two months during the period of redemption, and Wassem, by his own statements, admissions and acts, had such an interest therein as to be to that extent responsible for

the value of the use of the land by the cattle for that period. (*Lutyen v. Ritchie*, 37 Ida. 473, 218 Pac. 430; *Tsuboi v. Cohn*, 40 Ida. 102, 231 Pac. 708, 39 A. L. R. 851; *Watson v. Arthur*, 142 Ark. 431, 218 S. W. 849; *Colonial & U. S. Mort. Co. v. Elsea*, 85 Kan. 106, 116 Pac. 249, Ann. Cas. 1912C, 1145; *Tulsa Petroleum Corp. v. Westmoreland*, 180 Okl. 459, 70 Pac. (2d) 110; *Sheridan v. Bean*, 49 Mass. (8 Metc.) 284; 41 Am. Dec. 507; *Stafford v. Ingersol*, 3 Hill (N. Y.), 38; *Kenneth v. Durgin*, 59 N. H. 560; *Tewksbury v. Bucklin*, 7 N. H. 518) and the court erred in refusing to enter judgment against Wassem to that extent.

The judgment is reversed and the cause remanded with directions to determine the proportionate value of the use of the land to be paid by Wassem because of the keep of the 15 head of bulls thereon for approximately two months during the period of redemption.

As thus modified the judgment is affirmed.

Five-sixths of the costs to appellants Caldwell.

Ailshie, C. J., Budge and Holden, JJ., concur.

Morgan, J., because of illness, did not participate in the decision of this case.

---

(August 21, 1939.)

### ON PETITION FOR REHEARING.

PER CURIAM.— ■ We have considered the petition for rehearing and concluded that it should be denied. In view of the fact that it was necessary for appellants to prosecute their appeal in order to obtain any relief, it is thought that appellants should recover their entire costs on appeal, and it is so ordered.

Petition denied.