745 P.2d 1087

**STATE of Idaho, Plaintiff-Appellant,**

v.

**Judy THOMPSON, Defendant-Respondent,**

and

**Rene Brown, Rebecca Nelson a/k/a Wolf and Lumen, Steve Wolf, Charlie Thompson, James Yarborough a/k/a Yarb, and Monte Brandt, Defendants.**

No. 16145.

Court of Appeals of Idaho.

Nov. 2, 1987.

Petition for Review Granted Jan. 26, 1988.

Jim Jones, Atty. Gen. by Lynn E. Thomas, Sol. Gen. (argued), Boise, for plaintiff-appellant.

Vernon K. Smith, Boise, for defendant-respondent.

BURNETT, Judge.

The state brings this interlocutory appeal from an order suppressing evidence obtained through a wiretap. Although the wiretap was authorized by a warrant, the district court suppressed the evidence because the application for the warrant contained information generated by a pen register which had been installed without a judicial determination of probable cause. Today we must decide whether use of the pen register was an issue properly before the district court and, if so, whether the court was correct in ruling that probable cause must be established before a pen register may be installed.

For reasons explained below, we hold that it was permissible for the district

court to consider the pen register issue. However, we further hold that the pen register was not regulated by statutes then existing, nor was it subject to any constitutional restraints under decisions of the United States Supreme Court. Accordingly, we reverse the suppression order. Nevertheless, we offer a critique of the Supreme Court decisions and we suggest that the time has come for Idaho to recognize and to apply the protective language of its own state constitution.

## I

In 1983 law enforcement officers began an investigation into an alleged conspiracy to smuggle marijuana into the Idaho State Correctional Institution (ISCI). Sources inside and outside the prison indicated that a drug supplier somehow was managing to deliver marijuana to inmates. Several informants—some named and some anonymous—pointed to Judy Thompson, the mother of an inmate, as the source of the marijuana.

Several months later, as part of the continuing investigation, the police applied for an *ex parte* court order to place a pen register on Judy Thompson's phone.[1] The application set forth no facts establishing probable cause. Indeed, the application asserted that pen registers were not governed by existing statutes and that the use of a pen register was free from any constitutional limitation because it did not consti-

tute a "search." The application was approved and an order was issued.

Approximately two weeks later, when operation of the pen register had been discontinued, Boise police officers conducted a six-day surveillance of Judy Thompson. The surveillance produced no incriminating evidence. The Ada County prosecuting attorney then applied for a warrant, denominated as an "order," authorizing a wiretap on Judy Thompson's telephone. A district judge reviewed the prosecutor's application, which was supported by an affidavit of the officer in charge of the investigation. The affidavit included information obtained from the pen register, which had disclosed several calls made to the number of a telephone used by a suspected drug dealer in Twin Falls. The district judge concluded that probable cause existed to issue the warrant. The police operated a wiretap for thirty days, after which the prosecutor applied for and received a thirty-day extension. The wiretap produced additional incriminating information.

The prosecutor filed criminal charges against Judy Thompson and six other persons. He alleged that the defendants had conspired to smuggle marijuana into the ISCI in violation of I.C. § 37–2732(a)(1)(B). After a seven-day preliminary hearing, the defendants were held to answer in the district court. Prior to trial, counsel for Thompson and the other defendants moved to suppress "the contents of any intercepted wire or oral communication, the record-

---

1. A pen register has been defined as "a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." *United States v. New York Telephone Co.*, 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 366–67 n. 1, 54 L.Ed.2d 376 (1977). A "touch-tone decoder" performs the same function on push-button telephones. A different device, the "trap and trace" or "cross frame unit trap," records the originating number of all incoming calls, whether completed or merely attempted. *See District Attorney for Plymouth District v. New England Tel. & Tel. Co.*, 379 Mass. 586, 399 N.E.2d 866 (1980). Yet another device, called a dialed number recorder, or DNR, recently has come into use. Although similar in function to the pen register, a DNR

has the additional feature of recording the duration of all calls on the target phone, whether incoming or outgoing. *See Commonwealth v. Beauford*, 327 Pa.Super. 253, 475 A.2d 783 (1984), *appeal dismissed*, 508 Pa. 319, 496 A.2d 1143 (1985). From the record before us, it appears that the equipment installed to monitor Thompson's phone actually was a DNR rather than a pen register. However, this distinction does not significantly alter our analysis. Although a DNR yields slightly more information than a pen register, the impact of the two devices on the target's privacy is generally similar. *Cf. Commonwealth v. Beauford, supra* (distinction between DNR and pen register of no significance to analysis under Pennsylvania statute). For the sake of convenience, we will refer to both devices by the common term of pen register, unless otherwise specified.

ings thereof or evidence derived therefrom ... that were intercepted through electronic, mechanical and/or other devices...." Several grounds were listed in support of the motion. However, the salient issue was whether the application seeking the wiretap was supported by probable cause. The suppression motion was heard and decided by a district judge, the Honorable W.E. Smith, who had neither authorized the pen register nor issued the wiretap warrant. He concluded that the warrant application lacked probable cause because the pen register had been installed unlawfully and that without the information generated by the pen register, probable cause for a wiretap could not have been established. The state promptly filed this appeal.

## II

The state contends that Judge Smith acted improperly by addressing the pen register issue *sua sponte*. Although the motion to suppress was broad in scope, the legality of the pen register was not specifically argued in the district court. However, Judge Smith viewed the legality of the pen register as a necessarily included issue. He stated, "[T]he Court feels that it must address the issue of whether law enforcement officers may obtain a pen register on a suspect's phone without a warrant based upon probable cause." The state now argues that by addressing this issue, the judge exceeded his constitutional powers under Article 5, §§ 1 and 20, of the Idaho Constitution. These provisions describe the subject-matter jurisdiction of the district courts.[2] Thus, the state apparently would have us hold that the judge's decision was a nullity due to jurisdictional defects.

We decline to so hold. In our view, a judge does not lose jurisdiction over a case by deciding it on legal grounds other than those argued by the parties. He may commit error by deciding the case in this fashion. But decisional error is not to be equated with a lack of jurisdiction.

It is well established that a trial court ought not to base its decision on a theory completely unrelated to any of the issues raised by the parties. *See, e.g., Brantley v. Carlsbad Irrigation District*, 92 N.M. 280, 587 P.2d 427 (1978); *In re Estate of Hurlbutt*, 36 Or.App. 721, 585 P.2d 724 (1978). In such a situation, the court places those aggrieved by its decision in a potentially awkward position on appeal. It forces them to address issues not presented below. It also forces them to address the issues in the context of a record different from that which they might have created if the issues had been properly framed. Finally, it forces appellate judges to do something they should seldom do—consider issues not previously urged by the parties below. *Dursteler v. Dursteler*, 108 Idaho 230, 697 P.2d 1244 (Ct.App.1985).

These concerns relate to fairness and efficiency in judicial administration. But they do not invoke a rigid bar of jurisdiction. Moreover, these concerns, drawn largely from civil cases, do not necessarily apply with equal force to a motion for suppression of evidence in a criminal prosecution. Here, the legal status of information derived from the pen register was squarely, "in substance and effect, within the issue." *State ex rel. McManus v. Muench*, 217 Mo. 124, 117 S.W. 25 (1909). The question presented was whether the evidence obtained from the wiretap should have been suppressed because the application for the wiretap warrant was not sup-

---

**2.** Article 5, § 1, provides as follows:

Forms of action abolished.—The distinctions between actions at law and suits in equity, and the forms of all such actions and suits, are hereby prohibited; and there shall be in this state but one form of action for the enforcement or protection of private rights or the redress of private wrongs, which shall be denominated a civil action; and every action prosecuted by the people of the state as a party, against a person charged with a public offense, for the punishment of the same, shall be termed a criminal action.

Feigned issues are prohibited, and the fact at issue shall be tried by order of court before a jury.

Article 1, § 20, further provides as follows:

Jurisdiction of district court.—The district court shall have original jurisdiction in all cases, both at law and in equity, and such appellate jurisdiction as may be conferred by law.

ported by probable cause. The probable cause determination centered on the information provided in the affidavit supporting the prosecutor's application. The information obtained from the pen register constituted a substantial portion of the evidence in the affidavit. Indeed, the state's brief on appeal acknowledges that "[w]ithout [the pen register], the police in this case would not have been able to develop probable cause for the wire tap...." The judge, presented with the question of whether probable cause had been established, could not ignore the role of the pen register in producing the information furnished to him.

We emphasize that it would have been preferable for the judge to identify the pen register issue, and to invite supplemental evidence or briefs, before announcing his decision. But this procedural oversight did not eviscerate his jurisdiction. At most, the oversight would constitute a basis to remand the matter back to Judge Smith for a rehearing. However, for reasons discussed in Part III below, we find a remand to be unnecessary. It is sufficient to hold at this juncture that the district judge did not act beyond his jurisdiction.

### III

We now turn to the merits of the pen register issue. Our discussion focuses initially upon federal and state statutes. We then examine the search and seizure provisions of the federal and state constitutions.

### A

■ The district judge noted that the use of pen registers was not governed by the federal wiretap statute, 18 U.S.C. §§ 2510–2520, in effect when this case arose. The federal statute had been authoritatively construed by the United States Supreme Court in *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). The Court's analysis began by reference to the language of the statute itself:

> [The statute] is concerned only with orders "authorizing or approving the *interception* of a wire or oral communica-

tion...." 18 USC § 2518(1) (emphasis added). Congress defined "intercept" to mean "the *aural* acquisition of the contents of any wire or oral *communication* through the use of any electronic, mechanical, or other device." 18 USC § 2510(4) ... (emphasis added). Pen registers do not "intercept" because they do not acquire the "contents" of communications, as that term is defined by 18 USC § 2510(8).... Indeed, a law enforcement official could not even determine from the use of a pen register whether a communication existed. These devices do not hear sound. They disclose only the telephone numbers that have been dialed—a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed is disclosed by pen registers. Furthermore, pen registers do not accomplish the "aural acquisition" of anything. They decode outgoing telephone numbers by responding to changes in electrical voltage caused by the turning of the telephone dial (or the pressing of buttons on push button telephones) and present the information in a form to be interpreted by sight rather than by hearing....

*Id.* at 166–67, 98 S.Ct. at 369–70 (footnotes omitted).

With all due respect to the United States Supreme Court, we find its analysis in *New York Telephone* to be unsatisfactory. Under 18 U.S.C. § 2510(8), the "contents" of a communication include "any information concerning the *identity* of the parties to [the] communication or the *existence*, substance, purport or meaning of [the] communication." (Emphasis added.) To say that a pen register does not disclose the "existence" of a communication, merely because it does not confirm that the call was actually completed, is to strain at common sense. Although a pen register may not prove with certainty the existence of a communication, it certainly provides "information concerning ... the existence" of a communication. Further, as mentioned in footnote 1, *supra*, a dialed number recorder

(DNR) reveals the duration of a call, which effectively informs the observer whether the call was completed. Similarly, while knowledge of a number dialed does not prove conclusively the identity of the party called, it certainly provides information "concerning" his identity.

We also are troubled by the Supreme Court's suggestion that a pen register does not "intercept" a communication because it merely "respond[s] to changes in electrical voltage" and "present[s] the information in a form to be interpreted by sight rather than by hearing." This may be literally correct but it produces anomalous results. For example, one federal court applying *New York Telephone* has held that a machine which eavesdrops on computer communications over telephone lines, and which records the data being conveyed, does not "intercept" communications within the meaning of the statute. *See United States v. Seidlitz*, 589 F.2d 152 (4th Cir. 1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979). *See also United States v. Gregg*, 629 F.Supp. 958 (W.D.Mo.1986), *aff'd*, 829 F.2d 1430 (8th Cir.1987) (government surveillance of telex messages not "interception" within the meaning of federal wiretap statute). If this line of reasoning were taken to its logical conclusion, the federal wiretap statute would have no application to any machine capable of intercepting the electric impulses of a telephone conversation and translating those impulses into written form.

■ Although the Supreme Court's textual analysis of the federal statute is unconvincing, the legislative history provides

compelling evidence that Congress did not intend to regulate pen registers. As noted by a Senate committee: "The proposed legislation is not designed to prevent the tracing of phone calls. The use of a 'pen register,' for example, would be permissible.... The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication." S.Rep. No. 1097, 90th Cong., 2d Sess. 90, *reprinted in* 1968 U.S.CODE CONG. & ADMIN.NEWS 2112, 2178. Although some authorities have criticized the courts for undue reliance on legislative history, *see, e.g.,* R. DICKERSON, THE INTERPRETATION AND APPLICATION OF STATUTES ch. 10 (1975), such legislative materials as committee reports are generally considered "highly persuasive." *See* N. SINGER, SUTHERLAND—STATUTES AND STATUTORY CONSTRUCTION § 48.06 (4th ed. 1984). Here, the Senate's version of the statute ultimately was enacted into law. In light of the unequivocal expression of legislative intent found in the committee report, the Supreme Court's conclusion that Congress did not undertake to regulate the use of pen registers is virtually inescapable. In any event, we are bound by the Supreme Court's reading of a federal statute. Accordingly, we hold, as did the district court, that use of the pen register in this case was not regulated by the federal statute.[3]

### B

■ The district judge also considered whether use of the pen register was regulated by then-existing Idaho wiretap statutes, appearing in title 18, chapter 67, of

---

**3.** Congress recently enacted legislation regulating the use of pen registers. *See* Electronic Communications Privacy Act of 1986, P.L. 99–508, 100 Stat. 1848–1873 (1986) (codified in pertinent part at 18 U.S.C. §§ 3121–3126). The new statute, which became effective in January of this year, requires law enforcement officers to obtain a court order before installing a pen register or a trap and trace device. The applicant must certify that "the information likely to be obtained is relevant to an ongoing criminal investigation...." 18 U.S.C. § 3122. The order must specify, *inter alia*, the identity of the tar-

get, if known, and the offense under investigation. 18 U.S.C. 3123. However, the statutory scheme "does not envision an independent judicial review of whether the application meets the relevance standard, rather the court needs only to review the completeness of the certification submitted." S.Rep. No. 541, 99 Cong.2d Sess. 47, *reprinted in* 1986 U.S.CODE CONG. & ADMIN.NEWS 3555, 3601. The federal statute governs both federal and state law enforcement personnel; however, it does not preempt stricter state regulation of pen registers.

the Idaho Code.[4] It is well established that Congress did not intend to preempt all state regulation of electronic surveillance through the passage of the federal statutes on the subject; rather, Congress established a minimum level of protection for the privacy of wire and oral communications below which state standards cannot fall. *E.g., United States v. McKinnon,* 721 F.2d 19 (1st Cir.1983). State statutes which regulate electronic surveillance more stringently than their federal counterpart are permitted. *E.g., Warden v. Kahn,* 99 Cal.App.3d 805, 160 Cal.Rptr. 471 (1979); *State v. Catania,* 85 N.J. 418, 427 A.2d 537 (1981).

■ However, the district judge in this case concluded, and we agree, that the Idaho Legislature did not intend to regulate the use of pen registers in the statutes applicable here. The Idaho Supreme Court has held that "[a] statute which is adopted from another jurisdiction will be presumed to be adopted with the prior construction placed upon it by the courts of such other jurisdiction." *Nixon v. Triber,* 100 Idaho 198, 200, 595 P.2d 1093, 1095 (1979). The presumption is not conclusive; a clearly unreasonable interpretation of a statute will not be followed. *Chatterton v. Luker,* 66 Idaho 242, 158 P.2d 809 (1945); *Caldwell v. Thiessen,* 60 Idaho 515, 92 P.2d 1047 (1939). But an interpretation consistent with the federal statute in this case is reasonable. The Idaho statutes were modeled after part of the federal Omnibus Crime Control and Safe Streets Act of 1968. *New York Telephone,* the case which conclusively established that pen registers were not regulated by the federal statute in question here, was decided in 1977. The Idaho Legislature did not enact title 18, chapter 67, until 1980. *See* 1980 Idaho Sess. Laws, ch. 326, p. 833. Accordingly, we presume that the Idaho Legislature was aware of the federal interpretation of the statute and that the state legislators would have modified the statute if pen registers were intended to be covered. The district judge was correct in his determination that the Idaho statutes in effect when this case was decided did not regulate the use of pen registers.

### C

■ The district judge further held that use of the pen register was not a search within the meaning of the Fourth Amendment to the United States Constitution. The judge relied for this holding upon *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). In that case the United States Supreme Court employed the "reasonable expectation of privacy" analysis first enunciated in Justice Harlan's concurring opinion in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The *Katz* analysis is two-tiered. First, the individual must demonstrate an actual expectation of privacy; second, the expectation must be one that society is prepared to recognize as reasonable.

Justice Blackmun, writing for the majority in *Smith,* stated that the defendant did not have a subjective expectation of privacy in the numbers he dialed on his telephone. Telephone users, said Justice Blackmun, realize that they must "convey" phone numbers to the telephone company. Moreover, they realize that the company has equipment for recording the numbers dialed, and that the company keeps a record of all toll calls. Even if the defendant could show a subjective expectation of privacy in the numbers he dialed, Justice Blackmun opined that such an expectation was "not one society is prepared to accept as reasonable." *Id.* 442 U.S. at 743, 99 S.Ct. at 2582. Analogizing to federal cases involving government access to bank records, *see United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), Justice Blackmun determined that a subscriber "assumes the risk" that information he "voluntarily turns over to third parties" will be disclosed. *Smith,* 442 U.S. at 745, 99 S.Ct. at 2583. Accordingly, the installation of a pen register was held not to be a search within the meaning of the

---

**4.** Legislation virtually identical to the new federal statute on pen registers was enacted recently in Idaho. *See* 1987 Idaho Sess.Laws, ch. 215, p. 460, now codified in I.C. §§ 18–6719 to –6725.

Fourth Amendment. Of course, *Smith* is binding upon us in our analysis of the Fourth Amendment.

## D

The remaining question is whether installation of the pen register constituted a search within the meaning of Article 1, § 17, of the Idaho Constitution.[5] The district judge answered this question in the affirmative.

### 1

For reasons to which we will turn momentarily, we believe there is merit in the district judge's position. However, we cannot disregard the Idaho Supreme Court's policy declaration that Article 1, § 17, "is to be construed consistently with the fourth amendment to the United States Constitution." *State v. Cowen*, 104 Idaho 649, 650, 662 P.2d 230, 231 (1983). As we said in *State v. Schaffer*, 107 Idaho 812, 814, 693 P.2d 458, 460 (Ct.App.1984), "We may not agree with this policy, but we are bound by it." Accordingly, we are constrained to hold that the state constitution, as presently construed, provides no greater protection against pen registers than does the Fourth Amendment. This is to say that it affords no protection at all in light of *Smith v. Maryland, supra.*

There are signs that the Idaho Supreme Court is rethinking its policy of allowing the United States Supreme Court to dictate, in effect, the meaning of our state constitution. In *State v. Lewis*, 107 Idaho 616, 618, 691 P.2d 1231, 1233 (1984), Justice Shepard, speaking for a unanimous Court, said that a decision by the United States Supreme Court on a search-and-seizure question was binding "only as to the United States Constitution and ... not ... as to state constitutional provisions...." More recently, in *State v. Johnson*, 110 Idaho 516, 520 n. 1, 716 P.2d 1288, 1292 n. 1 (1986), the Court observed that the similar wording of the Fourth Amendment and of Article 1, § 17, "does not necessarily demand similar interpretation." However, neither in *Lewis* nor in *Johnson* did the Court actually apply the state constitution to reach a result different from the outcome under the Fourth Amendment. Consequently, a separate body of state jurisprudence on search-and-seizure issues has not yet emerged. But for reasons we now set forth, we believe the time has come for Idaho to assert its own constitution, particularly with respect to the issue of pen registers.

### 2

We are aware that it is important to encourage consistency in the development of state and federal law. In this regard, federal sources of constitutional doctrine are of great value, for it is the federal Constitution which guarantees a minimum level of protection of individual rights below which the states may not fall. However, a state may accord to its citizens protections greater than those found in the federal Constitution. Indeed, the United States Supreme Court has recognized that states may rely on their own constitutions to protect civil liberties because each state has the "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980). *See also Oregon v. Haas*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

We note a trend in recent opinions of the United States Supreme Court to narrow the protections accorded Americans by the Bill of Rights, including the Fourth Amendment, and by the due process clause of the Fourteenth Amendment. Scholars of constitutional law have discerned a connection between Supreme Court decisions affecting individual liberties and decisions of state courts placing increased reliance upon their

---

5. Article 1, § 17, provides as follows:
   The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized.

own constitutions. *See, e.g.,* Brennan, *State Constitutions and The Protection of Individual Rights,* 90 HARV.L.REV. 489 (1977). In the last several years, a great deal of literature has been written on this subject.[6] This body of literature reflects recent developments in the state courts. Since 1970, state courts have handed down more than 350 decisions extending to individuals more protections under their state constitutions than are guaranteed to them under the federal Constitution.[7] Marcotte, *Federalism and the Rise of the State Courts,* 73 A.B.A.J. 60 (April 1987). This trend is particularly strong in search-and-seizure jurisprudence. *See* Abramson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law,* 63 TEX.L.REV. 1141 (1985).

Idaho courts have long recognized the importance of the protections afforded citizens against unlawful searches and seizures under Article 1, § 17, of the state constitution. *See State v. Severns,* 47 Idaho 246, 273 P. 940 (1929); *State v. Wansgaard,* 46 Idaho 20, 265 P. 671 (1928); *State v. Arrequi,* 44 Idaho 43, 254 P. 788 (1927); *Purkey v. Maby,* 33 Idaho 281, 193 P. 79 (1920). Many well-reasoned decisions of other state courts have concluded that the search-and-seizure provisions of their constitutions provide greater protections than the Fourth Amendment.[8] We should continue to give the highest regard to the precedents of the federal courts. However, we should not be bound by federal decisions inconsistent with the history and values embodied in our state constitution.

In our view, the United States Supreme Court's analysis of pen registers in *Smith v. Maryland, supra,* is unpersuasive. It is true, of course, that a subscriber who dials a telephone number must in some sense "convey" the number to the telephone company. It is equally true that the very contents of the communication itself pass via lines owned by the company en route to its destination. Yet the Supreme Court has held that a caller may have a reasonable expectation of privacy in a telephone conversation. *See Katz v. United States, supra.* It does not necessarily follow that by "communicating" the number dialed to the telephone company—that is, by sending a signal to the computer switching system which makes the proper connection—the caller abandons all expectation of privacy in the number dialed. A caller who conveys numbers to the telephone company for a limited business purpose need not assume that those numbers will be released to other persons for other purposes. *Smith v. Maryland,* 442 U.S. at 749, 99 S.Ct. at 2584-85 (Stewart, J., dissenting). *Cf. Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel employee, though he may enter a patron's room in the performance of his duties, cannot confer

---

**6.** One excellent piece is a collection of articles taken from the Conference on the Emergence of State Constitutional Law at the University of Texas Law School in January 1985. *See* Vol. 63 of the Texas Law Review.

**7.** We note the comments of the Idaho Supreme Court in *State v. Newman,* 108 Idaho 5, 10 n. 6, 696 P.2d 856, 861 n. 6 (1985):

[F]ederal and state constitutions derive their power from independent sources. It is thus readily apparent that state courts are at liberty to find within the provisions of their own constitutions greater protection than is afforded under the federal constitution as interpreted by the United States Supreme Court [citations omitted]. This is true even when the constitutional provisions implicated contain similar phraseology. Long gone are the days when state courts will blindly apply United States Supreme Court interpretation and methodology when in the process of interpreting their own constitutions.

**8.** A non-exhaustive list includes: *State v. Glass,* 583 P.2d 872 (Alaska 1978); *People v. Oates,* 698 P.2d 811 (Colo.1985); *State v. Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985); *State v. Ortiz,* 67 Hawaii 181, 683 P.2d 822 (1984); *State v. Reeves,* 427 So.2d 403 (La.1982); *District Attorney for the Plymouth District v. Coffey,* 386 Mass. 218, 434 N.E.2d 1276 (1982); *People v. Smith,* 420 Mich. 1, 360 N.W.2d 841 (1984); *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216 (1978); *State v. Havlat,* 222 Neb. 554, 385 N.W. 2d 436 (1986); *State v. Koppel,* 127 N.H. 286, 499 A.2d 977 (1985); *State v. Novembrino,* 105 N.J. 95, 519 A.2d 820 (1986); *State v. Caraher,* 293 Or. 741, 653 P.2d 942 (1982); *State v. Atkinson,* 64 Or.App. 517, 669 P.2d 343 (1983); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979); *State v. Opperman,* 247 N.W.2d 673 (S.D.1976); *State v. Gunwall,* 106 Wash.2d 54, 720 P.2d 808 (1986); *State v. Doe,* 78 Wis.2d 161, 254 N.W.2d 210 (1977).

authority on the police to search the room); *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord, though he may enter a tenant's premises to view waste, cannot admit police onto the premises to conduct a search); *DeMassa v. Nunez*, 770 F.2d 1505 (9th Cir.1985) (client has legitimate expectation of privacy in attorney's files). *See also State v. Johnson*, 110 Idaho 516, 716 P.2d 1288 (1986).

The *Smith* Court relied heavily upon *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). In that case, law enforcement officers ordered a bank to turn over the financial records of a depositor. The Court held that the depositor, by voluntarily turning financial information over to his bank, assumed the risk that the bank would reveal such information to third parties. 425 U.S. at 442–43, 96 S.Ct. at 1623–24. However, many jurisdictions have rejected *Miller* and have held as a matter of state law that a customer can assert a reasonable expectation of privacy in his bank records. *See, e.g., Burrows v. Superior Court*, 13 Cal.3d 238, 118 Cal. Rptr. 166, 529 P.2d 590 (1974); *Charnes v. DiGiacomo*, 200 Colo. 94, 612 P.2d 1117 (1980); *Winfield v. Division of Pari-Mutuel Wagering*, 477 So.2d 544 (Fla.1985); *People v. Jackson*, 116 Ill.App.3d 430, 72 Ill.Dec. 153, 452 N.E.2d 85 (1983); *Commonwealth v. DeJohn, supra*. These courts have concluded that an assumption of risk analysis is not appropriate to bank records. We agree. The services of banks, like those of telephone companies, are indispensable in today's business environment. A citizen who renounces the use of telephones and the use of banks, in an effort to preserve his privacy, cuts himself off from modern society. Thus, the disclosure of information to telephone companies or banks ought not to be treated as an abdication of a privacy interest.

The Idaho Supreme Court has recognized this fundamental point. The Court has held that banks have a duty to preserve the confidentiality of their depositors' records.

It is inconceivable that a bank would at any time consider itself at liberty to disclose the intimate details of its depositors' accounts. Inviolate secrecy is one of the inherent and fundamental precepts of the relationship of the bank and its customers or depositors.

*Peterson v. Idaho First Nat'l Bank*, 83 Idaho 578, 588, 367 P.2d 284, 290 (1961). The Court in *Peterson* found that nondisclosure of information was an implied term of the contract between a bank and its depositors. *Peterson* undermines the policy and intellectual underpinnings on which *Smith v. Maryland* rests.[9]

The United States Supreme Court apparently assumed in *Smith* that revelation of numbers dialed by a telephone subscriber is not intrusive. We do not share this assumption. Admittedly, a record of numbers dialed—and, in the case of a DNR, the length of the calls—is not as intrusive as a wiretap. However, information concerning the numbers dialed, and the duration of the calls, is circumstantial evidence as to the content of those calls. Thus, in a Pennsylvania case where the subscriber received a large volume of calls of less than one minute duration between 12:00 p.m. and 7:00 p.m., Monday through Saturday, it was held that such information was strong evidence that the subscriber was operating a gambling ring based on a lottery game in

---

**9.** In some cases it could be argued that the expectation of privacy in telephone calls is even greater than in bank records. In the case of bank records, the government seeks access to existing documents maintained by the bank with the knowledge of the depositor. In the case of telephone calls monitored by pen registers the government creates a record containing information that would not ordinarily be kept. Although long distance carriers maintain records of toll numbers, local call records are rarely, if ever, recorded. *See Reporters Committee for Freedom of the Press v. American Tel. & Tel. Co.*, 593 F.2d 1030, 1036 (D.C.Cir.1978), *cert.* denied, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979). Thus, the telephone company is in possession of the information regarding the local number dialed by a subscriber only for the fleeting moment that it passes through the electronic relay in a switchbox. It then vanishes forever, unless law enforcement officers are there to record it. In the present case, however, the critical information disclosed by the pen register was a series of long-distance calls from Boise to a telephone used by a suspected drug supplier in Twin Falls. Consequently, this case is analogous to bank record cases, where the records already exist.

which results are announced Monday through Saturday at 7:00 p.m. *Commonwealth v. Beauford, supra.*

Of course, our objective is not to protect criminal misconduct. Rather, it is to safeguard the privacy of Idaho's law-abiding citizens who rely on the telephone for the conduct of their personal and business affairs. The use of a pen register can reveal innocent activities which the caller may prefer to keep private, such as calls to political figures, newspaper reporters, prospective employers, doctors or lawyers. We believe a telephone subscriber in Idaho has a subjective expectation that the telephone company will not record the numbers he dials and then give such information to a third party without his consent, unless the information is maintained by the company and is accessible in the ordinary course of business. We further believe that such an expectation of privacy is one which the people of Idaho are prepared to accept as reasonable.

We are not alone in suggesting that pen registers are subject to constitutional limitations. Before the United States Supreme Court's decision in *Smith v. Maryland,* many courts had assumed that use of a pen register was a search within the meaning of the federal Constitution. *See, e.g., United States v. Southwestern Bell Tel. Co.,* 546 F.2d 243 (8th Cir.1976), *cert. denied,* 434 U.S. 1008, 98 S.Ct. 716, 54 L.Ed.2d 750 (1978); *Application of the United States In the Matter of an Order Authorizing the Use of a Pen Register,* 538 F.2d 956 (2d Cir.1976), *rev'd, United States v. New York Telephone Co., supra; United States v. Falcone,* 505 F.2d 478 (3d Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); *State v. Ramirez,* 351 A.2d 566 (Del.Super.Ct.1976) *overruled, State v. Miller,* 449 A.2d 1065 (Del.Super. Ct.1982). Indeed, a previous Supreme Court opinion strongly suggested as much. *See United States v. Giordano,* 416 U.S. 505, 533–34 n. 19, 94 S.Ct. 1820, 1835 n. 19, 40 L.Ed.2d 341 (1974) (plurality opinion) (suppressing pen register evidence because warrant authorizing installation of pen register based upon unlawfully obtained evidence). One scholar has argued that Con-

gress did not undertake to regulate pen registers in the original wiretapping statute because it believed pen registers were already subject to constitutional limitations. *See* Fishman, *Pen Registers and Privacy: Risks, Expectations, and the Nullification of Congressional Intent,* 29 CATH.U.L.REV. 557 (1979–80).

*Smith v. Maryland* has been roundly criticized by the commentators. *See, e.g.,* 1 W. LAFAVE, SEARCH & SEIZURE § 2.7(b) (1987) ("[s]uch a crabbed interpretation ... makes a mockery of the Fourth Amendment."); C. FISHMAN, WIRETAPPING & EAVESDROPPING § 28 (Supp. 1986) ("[t]he decision is an unfortunate reversal of prevailing lower court case law."). Since *Smith* was decided, at least five states have held that the use of a pen register is a search within the meaning of their respective state constitutions. *See People v. Blair,* 25 Cal.3d 640, 159 Cal. Rptr. 818, 602 P.2d 738 (1979) (telephone records); *People v. Sporleder,* 666 P.2d 135 (Colo.1983); *State v. Hunt,* 91 N.J. 338, 450 A.2d 952 (1982) (toll records); *Commonwealth v. Beauford, supra; State v. Gunwall,* 106 Wash.2d 54, 720 P.2d 808 (1986). Other states have expressly reserved the issue. *E.g., District Attorney for Plymouth District v. New England Tel. & Tel. Co.,* 379 Mass. 586, 399 N.E.2d 866 (1980); *State v. McGoff,* 517 A.2d 232 (R.I.1986).

If the Idaho Supreme Court were persuaded to hold that use of a pen register is a search under Article 1, § 17, of the Idaho Constitution, the next task would be to specify what law enforcement officers must do in order to install a legal pen register. It is axiomatic that a warrant must be obtained for a search unless the search falls within one of several judicially recognized exceptions to the warrant requirement. *E.g., State v. Johnson, supra; State v. Ellis,* 99 Idaho 606, 586 P.2d 1050 (1978); *State v. Rusho,* 110 Idaho 556, 716 P.2d 1328 (Ct.App.1986). No such exception is applicable here. Moreover, Article 1, § 17, quoted at footnote 5 *supra,* requires a warrant to be supported by probable cause. Facts purporting to establish probable cause must be weighed by a neu-

tral and detached magistrate, rather than by an officer engaged in the "often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948); *State v. Lang*, 105 Idaho 683, 685, 672 P.2d 561, 563 (1983). "[T]he police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). We see no reason to bypass the warrant requirement, and a probable cause determination, in pen register cases.

The new federal and state statutes, mentioned at footnotes 3 and 4, *supra*, require a court order for installation of a pen register. However, they require no factual showing other than a conclusory recital that the information likely to be obtained is relevant to an ongoing criminal investigation. We think the Idaho Constitution requires more. We submit that the applicant should provide the judicial officer particular facts establishing probable cause to believe that a crime has been, or is being committed, and that installation of the pen register is likely to generate information relevant to the investigation of that criminal activity. This standard would go beyond the conclusory recital permitted by the new pen register statutes.

Conversely, this standard would stop short of the existing requirements for a wiretap. As explained more fully below, police officers who desire to install a wiretap are required not only to show that the suspect is committing an offense, but also that probable cause exists to believe "that *particular communications* concerning that offense will be obtained through [the] interception." (Emphasis added.) *See* 18 U.S.C. § 2518(3)(b); I.C. § 18–6708(3)(b). Frequently, the only way to establish the particular communications element will be through the installation of a pen register. On the other hand, the failure of a pen register to yield an expected result may convince police officers that greater intrusion by use of a wiretap would be unwise. Thus, by requiring a probable cause showing less particularized than is needed for a wiretap, the law would provide the police an appropriate incentive to utilize the less intrusive means—the pen register—first.

3

In the present case, the application for a pen register would not have complied with the requirement we have articulated. The application simply identified the telephone listed under Judy Thompson's name and recited "that such telephone may be used in the furtherance of criminal activity regarding trafficking in controlled substances and dangerous drugs." The application contained no underlying facts. Rather, as noted earlier in our opinion, it stated that "a telephone decoding device and its installation does not constitute a search," and that the provisions of federal and state statutes were inapplicable. Although this statement conflicts with the views we express today, it was an accurate representation of the law extant in light of *Smith v. Maryland*. Because *Smith* is binding until the Idaho Supreme Court decides otherwise on state constitutional grounds, we must conclude that the pen register in this case was lawfully installed. Accordingly, the information obtained from the pen register could have been considered in determining whether probable cause existed for issuance of the wiretap warrant. We now turn to that question.

IV

The wiretap issue requires us to examine a statute—the Idaho Communications Security Act, I.C. §§ 18–6701—6718—never before analyzed by the Idaho appellate courts. We are guided in our inquiry by a vast body of federal case law based upon Title III of the Omnibus Crime Control Act, 18 U.S.C. §§ 2510–2520. As noted earlier, the Idaho Act, like many other state wiretapping statutes, is substantially similar to the federal scheme. The wiretap provisions in the Idaho Act recognize a tension between the efficient pursuit of organized crime and the right of privacy. The Act obliges the courts to measure the permissible use of sophisticated electronic surveillance equipment against the specific re-

straints imposed by the Legislature to avoid undue intrusions upon privacy.

The Act provides that in order to obtain authorization for a wiretap, the government must show the following:

(a) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 18–6706, Idaho Code;

(b) There is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

. . . .

(d) There is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

Idaho Code § 18–6708(3). Each of these determinations must be made separately. Lack of probable cause on any one statutory prong is fatal to an application for a wiretap order.

The statute thus assures that the constitutional mandate of probable cause for a search warrant is carried into the highly intrusive realm of electronic surveillance through wiretapping. *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). Subparagraph (a) requires the judge to determine whether there is probable cause to believe that a particular type of offense enumerated in section 18–6706 (here, drug trafficking) is being, has been, or is about to be committed by a particular person. Subparagraph (b) requires the judge to determine whether there is probable cause to believe that facts concerning that offense may be obtained through such interception. Finally, subparagraph (d) requires a finding of probable cause linking the wire or oral communications to be intercepted with the person suspected of the enumerated criminal activity. These three findings enable the wiretap warrant to specify a person, a specific type of crime and particular place. Taken together they are "intended to meet the test of the Constitution that electronic surveillance techniques be used only under the most precise and discriminate circumstances, which fully comply with the requirement of particularity." S.Rep. No. 1097, 90th Cong., 2d Sess. 90, *reprinted in* 1968 U.S.CODE CONG. & ADMIN.NEWS 2112, 2191. *See also Berger v. New York, supra.*

▮ In this case we review a district judge's decision on a motion to suppress. He held that the application for a wiretap warrant did not meet the foregoing requirements. His decision is subject to a standard of free review on appeal. In contrast, the underlying decision by the warrant-issuing judge is entitled to deferential review. The test is whether, in light of the totality of circumstances, the judge who issued the warrant had a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *State v. Lang*, 105 Idaho 683, 672 P.2d 561 (1983). The police affidavit accompanying the wiretap application must be interpreted in a practical and commonsense fashion. If the apparent facts are such that a reasonably discreet and prudent person would be led to believe that Judy Thompson was using the telephone in question to buy and sell narcotics, or to engage in a conspiracy for doing so, then the warrant must be upheld. *United States v. James*, 494 F.2d 1007 (D.C.Cir.1974), *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974).

▮ The affidavit in this case was lengthy and detailed. The affiant, a Boise police detective, recited his extensive experience investigating drug trafficking. He stated that he had been a police officer for ten years and a special investigator for five years. The affiant then stated that between February 1983 and September 1984, security officers at ISCI received at least eight reports from inmates that Charlie Thompson, Judy Thompson's son, was a major supplier of drugs within the prison. The prison report also indicated that Charlie Thompson had refused urine testing and that marijuana had been found in his cell. Several inmates had stated to law enforce-

ment officers that they believed Judy Thompson was responsible for smuggling the drugs, particularly marijuana, into the prison.

The affiant further recited that in August 1983, he interviewed a woman who recently had lived with Judy Thompson. This informant claimed that she had personal knowledge of Judy Thompson's drug activities. She stated that Judy obtained her drugs from a named Twin Falls resident who went to California twice each month to buy drugs. The woman had overheard conversations between this individual and Thompson concerning drugs. On at least one occasion, the individual had offered to take the informant on a drug "run" to California. She further stated that Judy Thompson headed a ring of women who smuggled drugs into the prison by passing them in balloons to inmates during visitation. The inmates would swallow the balloons and later retrieve them from their excrement.

The affiant averred that another named informant substantially corroborated this information. This informant also said that he personally had purchased marijuana from Thompson and that she was currently involved in drug trafficking. The affiant attested to this informant's reliability by noting that he previously provided information leading to an arrest and to the seizure of fifty pounds of marijuana in a separate case.

The affiant stated that additional information had been provided by an anonymous informant. This informant stated that Judy Thompson obtained drugs from the named individual in Twin Falls and that she arranged for the drugs to be smuggled into the prison. The affiant asserted that this informant was reliable because on three previous occasions he had provided information leading to the arrest of several suspects on burglary and grand theft charges.

The affiant went on to state that in September 1982 and September 1983, the Twin Falls office of the State Bureau of Investigation attempted to purchase narcotics from the named individual. These transactions fell through, the investigators claimed, because the individual had become suspicious of law enforcement activity afoot. The affiant further stated that Boise police surveilled Judy Thompson from August 26 through September 1, 1984. They discovered no evidence of drug dealing and, therefore, ended the surveillance. Finally, the affiant summarized the information obtained from the pen register. It disclosed that Judy Thompson had made several fresh calls to the telephone used by the Twin Falls supplier. Based on all this information, the warrant-issuing judge concluded that probable cause existed under I.C. § 18–6708(3)(a), (b) and (d) to authorize a wiretap of Judy Thompson's home telephone.

We believe the judge had a substantial basis for this conclusion. It is apparent from the affidavit that Thompson, the Twin Falls supplier and others had been participating in an ongoing scheme to distribute drugs. It is logical to assume that communications relating to this scheme would take place over the telephone, because Thompson and the Twin Falls supplier lived more than 100 miles apart. Moreover, it was reasonable to infer—and the pen register confirmed—that such communications would involve the use of Thompson's home telephone. The affidavit was sufficient to establish a reasonable basis for concluding that there was probable cause to believe that a narcotics conspiracy was in process and that communications particularly relating to drug transactions would be obtained by wiretapping Thompson's telephone.[10] I.C. § 18–6708(3)(a), (b) and (d).

---

10. We note that some of the information in the affidavit was up to eighteen months old. In several paragraphs, the affidavit failed to recite the precise dates on which events occurred. We remind police officers that all possible information, including dates and times, should be presented to the warrant-issuing judge. However, we do not find that the affidavit in this case was fatally flawed. Information which indicates continuous and prolonged criminal activity—such as the drug trafficking conspiracy in this case—does not become stale as rapidly as information indicating sporadic or occasional illegal acts. *United States v. Domme,* 753 F.2d

Accordingly, the order of the district court, suppressing evidence obtained from the wiretap of Judy Thompson's telephone, is reversed. This case is remanded for further proceedings consistent with this opinion.

McQUADE, J. Pro Tem, concurs.

SWANSTROM, Judge, specially concurring.

I join in the Court's opinion except that I reserve judgment on whether the use of a pen register is a "search" under the state constitution. I will consider that question in a future case if and when the Idaho Supreme Court makes it clear that federal decisions interpreting the United States Constitution do not dictate the meaning of the Idaho Constitution. Today's opinion performs an important service by framing this issue in a scholarly way.

950 (11th Cir.1985); *United States v. Bascaro,* 742 F.2d 1335 (11th Cir.1984); *United States v. Dorfman,* 542 F.Supp. 345 (N.D.Ill.1982). Here, the affidavit indicated that Judy Thompson had been involved for a long time in a drug ring. There was no evidence indicating that the ring had broken up or that Thompson had ceased to be involved in it. The pen register showed fresh contacts. On the facts of this case, we conclude that the information in the affidavit was not stale.