587 P.2d 427

**In the Matter of Application No. C–1593 of George H. Brantley to Supplement Surface Waters of the Carlsbad Irrigation District.**

**George H. BRANTLEY,**
**Applicant-Appellee,**

**v.**

**CARLSBAD IRRIGATION DISTRICT,**
**Protestant-Appellant,**

**and**

**S. E. Reynolds, New Mexico State Engineer, Respondent-Appellant.**

**No. 11610.**

Supreme Court of New Mexico.

Oct. 31, 1978.

Rehearing Denied Nov. 27, 1978.

McCormick & Forbes, Jay W. Forbes, Carlsbad, for protestant-appellant.

Toney Anaya, Atty. Gen., Richard A. Simms, Peter T. White, Don Klein, Jr., Sp. Asst. Attys. Gen., Santa Fe, for respondent-appellant.

J. Lee Cathey, Carlsbad, for applicant-appellee.

## OPINION

EASLEY, Justice.

Applicant-appellee, George H. Brantley, filed an application with the New Mexico State Engineer seeking to supplement his rights to irrigation waters. The Carlsbad Irrigation District (C.I.D.) protested. After a hearing the State Engineer denied the application. On appeal to the District Court of Eddy County the case was tried de novo. Judgment was entered in favor of Brantley. The State Engineer and C.I.D. appeal. We reverse.

The issue is whether the owner of 3 acre-feet per year of surface water irrigation rights, who has lost a portion of this water below the diversion point from the river due to seepage from a twenty-five mile long transporting canal, may recapture the loss by drilling a well in a declared underground basin into which the seepage has gone.

The C.I.D., under contract with the United States and with the individual owners of water rights within the district, diverts waters from the surface flows of the Pecos River at Avalon Dam and delivers these waters into the main canal. The main canal begins at Avalon Dam and runs south for about twenty-five to twenty-eight miles, where water allocated to Brantley is delivered into the "Brantley Ditch." From there Brantley's water is dumped into the north side of the Black River and he pumps an equal amount out of the Black River from the south side. Brantley has a right, as do the other owners of water rights in the district, to 3 acre-feet per year for irrigation.

The C.I.D. diverts an average of 3 acre-feet per year for the 25,055 acres irrigated by the project into the main canal at Avalon Dam. However, due to evaporation, drainage, and seepage losses in the canal system, the C.I.D. delivers only approximately 2.1 acre-feet per year to the farms irrigated by the project.

The seepage, as well as drainage from the irrigated lands, percolates downward into the alluvium of the Pecos Valley Fill and becomes part of the Carlsbad Underground Basin. Applicant seeks to supplement his water supply by drilling a well into the Pecos Valley Fill to recapture the .9 acre-feet of water to which he claims to be entitled, but which is not now being delivered to him.

This Court in *Langenegger v. Carlsbad Irrigation District*, 82 N.M. 416, 419, 483 P.2d 297, 300 (1971) stated:

> [A]ppropriators of water from the mainstream or channel of the Pecos River . . . are entitled, subject to the rights of other appropriators, to rely and depend upon *all the sources* which feed the main stream *above their points of diversion*, all the way back to the farthest limits of the water shed. *Templeton v. Pecos Valley Artesian Conserv. Dist.* [65 N.M. 59, 332 P.2d 465 (1958)]. (Emphasis added.)

*Templeton* established what has become known as the "Templeton Doctrine" under which appropriators of surface waters, whose volumes have diminished, have been allowed to supplement their appropriations by drilling wells upsteam into underground

282

waters which are a source of the surface waters in which they have rights.

Brantley tendered and the trial court adopted the following findings of fact:

15. That there has been an average of 3 acre-feet of water per annum for the 25,055 acres of land of the Carlsbad Irrigation Project *delivered at the main canal of said Project.*

30. That the proposed appropriation of water by applicant from a ground water well to bring his surface water rights to 3 acre-feet per acre per annum amounts to a recapture of the waters *delivered at the main canal* of the Carlsbad Irrigation District which are lost by leakage from the canal system and drainage from the irrigated land of the Project; that *this is the same water which applicant proposes to appropriate* from a ground water well *as is diverted at the main canal* of the Carlsbad Irrigation District and which applicant is entitled to have delivered on his land. (Emphasis added.)

▪ The above findings establish that the point of diversion for the lands irrigated by the project is the point where surface water is delivered into the main canal at Avalon Dam. Brantley proposes to drill a well on his farm approximately twenty-five miles below this point of diversion. There is no evidence that the ground water under Brantley's farm is a source of the surface flow of the Pecos at Avalon Dam. In fact, the trial court found the opposite; that the surface flow of the Pecos, diverted into the main canal, leaks from that canal and drains from irrigated lands, and is itself a source of the underground water which Brantley seeks to tap. This finding is based on substantial evidence.

▪ There is even evidence that the particular area of the valley fill where Brantley's surface water is lost is separated from where he seeks to drill by an impermeable underground geologic formation. If correct, this evidence would indicate that there is no connection at all between his lost water and the water he seeks by this appli-

cation. In either case the "Templeton Doctrine" does not apply since Brantley seeks to drill *below* his point of diversion into waters which are not a source of his surface right.

*Kelley v. Carlsbad Irrigation District,* 76 N.M. 466, 415 P.2d 849 (1966) is controlling here. This court held in that case:

When an artificial or natural flow of surface water, through percolation, seepage or otherwise, reaches an underground reservoir and thereby loses its identity as surface water, such waters become public under the provisions of § 75–11–1, N.M. S.A., 1953 Comp., and are subject to appropriation in accordance with applicable statutes. It follows that one having a water right in a surface flow, which has thus been lost to the underground reservoir, can neither transfer his surface right nor change his point of diversion to the underground reservoir.

Id. at 472, 415 P.2d at 853. The underground reservoir in *Kelley* was the declared Roswell Artesian Basin.

On recross examination by counsel for the C.I.D., Brantley's expert witness testified:

A. . . . in my opinion, any well drilled anywhere in the alluvium under the Carlsbad Irrigation District is all water from the valley fill, . .

\* \* \* \* \* \*

Q. Now, this is a declared underground basin, isn't it?

A. Yes, sir.

The same expert witness testified on direct examination that the Black River was a "gaining stream" at the point of Brantley's farm. This means that the ground water under Brantley's farm flows into the Black River and is a contributing source to that river's surface flow at and below the point of Brantley's farm. There is uncontradicted evidence that the surface flow of the Black River is fully appropriated.

Brantley seeks to recapture water lost into a declared underground basin which is also a source of a fully appropriated surface flow. Since the "Templeton Doctrine" does not apply, the application must be denied as a matter of law. *Kelley, supra.*

In addition to ruling on the application, the trial court rendered findings of fact regarding the asserted failure of the C.I.D. to perform under its contracts with the United States and the owners of water rights within the district. These issues were not raised by the application, nor by the appeal from the State Engineer's denial of it, and they are not material to a disposition of the application. The trial court is not privileged to determine matters outside the issues of the case. *Ford v. Guarantee Abstract and Title Co., Inc.*, 220 Kan. 244, 553 P.2d 254 (1976); *Poole v. Poole*, 287 S.W.2d 372 (Mo.Ct.App.1956). It follows that the findings regarding the C.I.D.'s failure to perform under its contracts are of no force or effect.

The decision of the trial court is reversed. The trial court shall issue an order affirming the denial of Brantley's application by the State Engineer.

IT IS SO ORDERED.

PAYNE and FEDERICI, JJ., concur.