844 P.2d 831

**STATE of New Mexico, ex rel. Eluid MARTINEZ, State Engineer, Plaintiff–Appellee,**

v.

**CITY OF ROSWELL, Defendant–Appellant.**

**No. 11693.**

Court of Appeals of New Mexico.

Sept. 14, 1992.

Certiorari Denied Nov. 30, 1992.

Laura C. Harper, Sp. Asst. Atty. Gen., New Mexico State Engineer Office, Santa Fe, for plaintiff-appellee.

Fred H. Hennighausen, Hennighausen & Olsen, Roswell, for defendant-appellant.

## OPINION

ALARID, Chief Judge.

The City of Roswell appeals from a decision by the district court awarding summary judgment to the state. For reasons discussed herein we affirm the order granting summary judgment.

### Introduction

This case and its companion, *see State ex rel. Martinez v. Parker Townsend Ranch Co.,* (Ct.App.1992) (No. 11,679) arise out of complex litigation involving water rights in the Pecos stream system. The dispositive issues in both cases are deeply rooted in the hybrid administrative/adjudicative water rights system in New Mexico. *See* NMSA 1978, § 72–2–9 (Repl.Pamp.1985) (state engineer's supervisory authority over apportionment of water); NMSA 1978, § 72–4–15 (Repl.Pamp.1985) (attorney general's authority to enter suit at state engineer's request to adjudicate water rights on behalf of state). In this case we are called upon to analyze *Templeton v. Pecos Valley Artesian Conservancy District,* 65 N.M. 59, 332 P.2d 465 (1958), and subsequent cases interpreting the scope of its application. *See State ex rel. Reynolds v. Allman,* 78 N.M. 1, 427 P.2d 886 (1967); *State ex rel. Reynolds v. Pecos Valley Artesian Conservancy Dist.,* 99 N.M. 699, 663 P.2d 358 (1983). Specifically we decide the extent of the hydrogeologic relationship between surface water and groundwater that must be demonstrated to properly invoke the *Templeton* doctrine.

### History of This Case

This appeal began as a general adjudication of water rights in Chaves County initiated in 1956 by the State of New Mexico

and the Pecos Valley Artesian Conservancy District only with respect to Roswell Artesian Basin *groundwater* rights (Case No. 20294). The groundwater adjudication was subsequently consolidated with a second suit filed in 1958 by the same parties to adjudicate the water rights of the Hagerman Irrigation Company and those of each individual using water from the Hagerman Canal (Case No. 22600). The consolidated cases become known as the *Lewis* case. The adjudication was expanded in 1974 to encompass both the surface and groundwater uses, and was expanded geographically to include the tributary Rio Hondo system. The rights at issue in this case are in the Rio Hondo system.

The City of Roswell's predecessor in title adjudicated a supplemental groundwater right in 1962 for wells RA–2887 and RA–2888 in Case No. 20294, the original groundwater adjudication in this stream system. The supplemental groundwater right was assigned a priority date of 1949, the documented date of the drilling of the wells, and encompassed irrigation rights to 556.7 acres. The subfile to which the 1949 priority applies appears in the record and is styled RAB–1667. The water in the wells is described in the subfile order as "Artesian Supplemental to Hondo." Wells RA–2887 and RA–2888 irrigate more acreage than the 556.7 acres held by the City's predecessor in title; however, the rights appurtenant to 550 of the 556.7 acres were purchased by the City and moved to its municipal well field in 1967.

After consolidation of the two cases, the supreme court held in *Allman* that because the water rights holders in Case No. 22600 were permitted to present evidence in order to "relate back" the priority date of their supplemental wells to the initial surface water priority dates, and thereby establish earlier priorities than the date their supplemental wells were drilled, due process required that the water rights holders in Case No. 20294 be given the same opportunity. *Allman.* The state began reopening subfile orders to provide the required opportunity.

As a result of a priority call on the river in 1976, a modified adjudication procedure was adopted that accommodated the *Allman* mandate and permitted priority enforcement. The modified adjudication procedure called for individual show cause hearings to "finally adjudicate" the priority element of the water right identified in the show cause order and was approved by our supreme court in *Pecos Valley Artesian Conservancy District. See also Parker Townsend Ranch Co.* Pursuant to the modified adjudication procedure and after some procedural difficulties, the City of Roswell was ordered to show cause why its transferred water right priority should not be "finally adjudicated" in accordance with a subfile order fixing the supplemental groundwater priority at 1949 for the wells from which the City of Roswell obtained its rights.

*Discussion*

The district court granted summary judgment to the state in the show cause proceeding by an order providing:

> The Court finds that any disputed issues of fact are immaterial under the Templeton doctrine, which allows the owner of a surface water right whose flows have diminished due to withdrawals from the contributing aquifer by subsequent appropriators, to change to an underground point of diversion and recapture groundwater that had been a source of supply for a surface right.

The City contends on appeal that disputed facts were relied upon by the district court to conclude that relation back under the *Templeton* doctrine was unavailable as a matter of law. The City also docketed and argued on appeal that the trial court erred by denying the City's cross-motion for summary judgment. The district court granted the state's motion for summary judgment and did not expressly rule on the City's motion. The City has appealed from the court's decision granting the state's motion. Under these circumstances, we need not address the City's motion.[1]

---

**1.** To carry its burden, the City adopted the     pleadings of a defendant in another show cause

*The Templeton Doctrine*

We now turn to the dispositive legal issue: the hydrogeologic relation between surface and groundwater that must be demonstrated to properly invoke the *Templeton* doctrine. We first review cases applying or discussing the doctrine to determine the prevailing interpretation. The traditional doctrine of relation back would hold that the priority of a water right relates back from the date of first beneficial application to the date work commenced to bring about the beneficial application. *State ex rel. Reynolds v. Mendenhall*, 68 N.M. 467, 362 P.2d 998 (1961). In this case the supplemental wells would have to be considered a mere change in diversion point rather than a new appropriation to benefit from the *Mendenhall* rule that the wells are part of a continuing plan of development. Whether the supplemental wells are a new appropriation or a change in diversion point turns on the application of *Templeton*.

The state moved for summary judgment on the ground that the City could not prove that the water obtained from wells RA–2887 and RA–2888 to supplement its predecessor's surface right was the same water the City's predecessor would have received from its point of surface diversion but for the interception of groundwater by upstream junior groundwater appropriators. The state claims "the groundwater in the vicinity of the subject wells is not, and has never been a source of flow for the Rio Hondo at the surface point of diversion."

In *Templeton*, the supreme court determined that substantial evidence supported a trial court ruling that the drilling of supplemental wells in the "Valley Fill" of the "Roswell Shallow Water Basin" to supplement a Rio Felix surface water right that was no longer available due to groundwater appropriations by upstream junior water users also pumping from the Valley Fill of the Shallow Water Basin, did not constitute a new appropriation from a fully appropriated water source that was closed to new appropriations, but instead constituted a request for a change in diversion point from a surface diversion to an underground diversion.[2] The logic of the case is simple: the Rio Felix is a channel cut into the saturated Valley Fill (alluvium) and its base flow is actually from the "same source" as the water found in the saturated alluvium but not appearing in the main channel as surface water. Therefore, supplemental wells drilled near the main channel in the saturated Valley Fill (alluvium) capture water from the same source as water that would have been diverted at a surface point of diversion but for the lowering of the water table caused by upstream junior groundwater appropriators pumping from the saturated Valley Fill. The court held, "that the appellees were

proceeding. *See Parker Townsend Ranch Co.* Therein Parker Townsend produced a subfile order entered in 1976 for a surface water irrigation right, which fixed an original surface water priority at 1884. The surface irrigation right appurtenant to the acreage currently owned by Parker Townsend is now obtained from wells RA–2887 and RA–2888. The record also discloses a subfile order entered in 1962 fixing the priority of wells RA–2887 and RA–2888 at 1949. RA–2887 and RA–2888 are the same wells at issue in the City's case. However, contrary to the situation in *Parker Townsend Ranch Co.* the 1976 subfile order fixing the priority of the surface water right does not include the acreage from which the City derived its well right. The record does not contain any subfile order adjudicating the priority of the City's antecedent surface right. Accordingly, this case is distinguishable from *Parker Townsend Ranch Co.*

**2.** The *Templeton* court described the hydrogeology as follows: there are two underground bodies of water in this area. The deepest one is known as the Roswell Artesian Basin, and the upper body of water is known as the Roswell Shallow Water Basin. These two bodies are separated by impervious red shale and gypsum, known as the Pecos Red Beds. Below the Pecos Red Beds is the body of artesian water and above the Pecos Red Beds is the Roswell Shallow Water Basin. Above the Pecos Red Beds and spreading over the basin is what is known as the Valley Fill which consists of topsoil, sand, gravel, shale, clay, and boulders which have been washed in and deposited through the centuries. The Shallow Water Basin is held in this Valley Fill * * * * The waters that fall on the headwaters of the stream [Rio Felix] run for a distance and then they lose themselves in the ground. In other words, the headwaters of the Rio Felix sink and become a part of the Valley Fill except for the times when the stream is in flood stage. 65 N.M. at 62, 332 P.2d at 466–67.

entitled to the waters of the Valley Fill that *flowed into the Rio Felix at the time of their [surface] appropriation."* *Id.,* 65 N.M. at 68, 332 P.2d at 471 (emphasis added).

█ Under *Templeton,* surface water and groundwater may be treated the same as a matter of law where certain factual predicates are demonstrated. The *Templeton* court affirmed the district court approval of the application for a change from a surface point of diversion to an underground well because "under the facts set forth above, the Valley Fill was *the* source of the flow of the river." *Id.* at 68, 332 P.2d at 471 (emphasis added). Under *Templeton,* a surface appropriator's legal entitlement to style its application for permission to drill a supplemental well as a simple change in diversion point rather than a request for new groundwater appropriation is limited to those situations where the factual underpinnings of the application demonstrate that the groundwater sought is water that otherwise would have reached the main channel and become a source of the surface flow in which the surface appropriator has rights. *Id.; see also Public Serv. Co. v. Reynolds,* 68 N.M. 54, 358 P.2d 621 (1960) (application to change diversion point may not be used to effect a new appropriation).

The City has relied on language appearing in *Templeton,* that an appropriator of surface water from a river may "rely" and "depend" on "all the sources which feed the main stream above his own diversion point, clear back to the farthest limits of the watershed," and argues that to successfully carry its burden in the show cause proceeding, it must simply demonstrate that its supplemental well captures water from the same *watershed* as the diminished surface flow. The City argued:

> The groundwater and surface water in Defendant's original [supplemental] wells and surface points of diversion are hydrologically related. Groundwater and surface water are hydrologically related when both are located in the same stream system, or watershed, both derive their water supply from the same source

and the surface flows supply the groundwater or the groundwaters supply the surface flow, or both conditions occur.

However, in light of subsequent supreme court pronouncements on this issue, which we discuss below, we believe the City has overlooked the progression of the holdings of the *Templeton* line of cases and has instead embraced the dicta. Because the hydrogeology of *Templeton* clearly indicates the base flow in the Rio Felix is but groundwater exposed by a channel cut through the Valley Fill, we view the scope of the dicta's applicability narrowly.

While primarily a statutory construction case, in *City of Albuquerque v. Reynolds,* 71 N.M. 428, 379 P.2d 73 (1962), the court construed the *Templeton* holding:

> [A] prior appropriator of stream water had the right to follow the stream water to its underground source and the right to drill wells and take the underground water necessary to fill his prior stream right, *regardless of detriment to other underground water appropriators whose rights were subsequent in time to the stream right.* This case, and what we have announced supra, effectively disposes of the broad proposition advanced by the city that the state engineer has no direction or authority from the legislature to protect prior appropriators of stream water from impairment at the hands of subsequent appropriators of underground water in basins, *the waters of which constitute a part of the base flow of a surface stream.* [Emphasis added.]

*Id.* at 438–39, 379 P.2d at 80. The quoted language indicates that the priority of the surface right may attach to a supplemental well only so long as the well captures water that constitutes a part of the base flow of the stream in which the surface rights obtain. This is *Templeton* water. If the well does not capture *Templeton* water, relation back of the priority date is impermissible and would improperly affect the vested rights of those with groundwater rights obtained subsequent in time to the surface stream right.

The *Reynolds* court did not merely rely on the *Templeton* holding, it also described the hydrogeological context necessitating the requirement that the supplemental well capture *Templeton* water.

> The relationships derived from Darcy's law show that the effects of ground-water withdrawals on a nearby stream arise gradually and that if the well is some distance from the stream many years elapse before the effects of the withdrawal are fully reflected in the stream-flows. The relationships show, however, that ultimately the annual stream-flow is reduced by an amount equal to the annual ground-water appropriation. The relationships also show that once a ground-water appropriation is made, and continued for a period of time, the effects on surface water flows are not terminated at the time that the ground-water appropriation is terminated but continue, gradually diminishing, for many years after the ground-water appropriation is ended.

*Id.* at 439–40, 379 P.2d at 81 (quoting the state engineer). It is obvious, therefore, that in a stream system and groundwater basin where both sources are fully appropriated, a supplemental well must capture water from the same source as the surface right or it would otherwise be appropriating water that belonged to another. The fact that there is a delay between the initial groundwater appropriation and its effect on the stream flow merely delays the discovery of the impairment on surface rights holders, but cannot erase it.

The supreme court distinguished *Templeton* in *Kelley v. Carlsbad Irrigation District*, 76 N.M. 466, 415 P.2d 849 (1966). In *Kelley* the applicant sought to drill a supplemental well to augment a diminished surface right. He sought to divert his portion of the Rio Hondo surface flow into the abandoned Hondo Reservoir (a surface water storage facility). The Hondo Reservoir had never held surface flow water because its base consists of a highly permeable geologic formation. All surface water

diverted into the Hondo Reservoir percolates downward into the saturated zone beneath the surface. The applicant sought to recover the water having percolated into the underlying formation by means of a well drilled into the underlying formation. The court reversed the district court's decision directing the state engineer to grant the application.

The crux of the *Kelley* opinion is that diverted surface flow cannot be returned to the underlying aquifer (whether the shallow basin or the deep aquifer) and then pumped back up to the surface as part of the same surface right. The diverted surface water, after percolating downward, is not *Templeton* water. Hydrologically, downward percolations of diverted surface water are the *sink* rather than the *source* of a surface appropriator's water under the *Templeton* doctrine. *Kelley*, 76 N.M. at 472, 415 P.2d at 853. If it were otherwise, every irrigator with surface rights could drill supplemental wells seeking to capture their own irrigation water return flow, upon which downstream surface appropriators rely. Such a possibility is inconsistent with the proper exercise of water rights under the doctrine of prior appropriation.

The *Templeton* doctrine was also applied and discussed in *Langenegger v. Carlsbad Irrigation District*, 82 N.M. 416, 483 P.2d 297 (1971). *Langenegger* involved a request to supplement a diminished surface right through the drilling of supplemental wells into the Roswell Underground Basin. However, the applicant's wells were to be drilled in the deep aquifer rather than the shallow basin as had been the case in *Templeton*.[3]

The court found Langenegger's application for a change in diversion point from the surface to a supplemental well presented a special case of the *Templeton* doctrine. In *Templeton* the water to be captured by the proposed supplemental well was considered to be *wholly* from the same source as the surface right, the Valley Fill

---

3. We note the *Templeton* court referred to the Red Beds as "impervious" and the *Langenegger* court called them "semi-confining." *Templeton,*

65 N.M. at 62, 332 P.2d at 466; *Langenegger* 82 N.M. at 418, 483 P.2d at 299.

(alluvium). In *Langenegger* the water captured by the proposed supplemental well was considered *one* of several sources from which the surface water right was satisfied. *Id.* at 419, 483 P.2d at 300.

The principal holding of *Langenegger* is that an appropriator seeking to change from a surface point of diversion to an underground point of diversion is entitled to seek the full extent of the historically available surface right from *any* one of the several sources of water contributing to the surface right. In *Langenegger* the sources of the surface right included base flow and flood flow. The base flow is made up of runoff water which makes its way through the shallow aquifer or Valley Fill and into the main channel. The base flow also includes the deep aquifer water that is indirectly connected hydrogeologically to the shallow aquifer because of a small amount of upward leakage through the Red Beds. *Id.* at 420–21, 483 P.2d at 301–02. The *Langenegger* court found no basis in law for restricting the appropriator to capturing from his supplemental well only that percentage of his historically available surface waters that could be said to have been captured from the base flow of the river. *Id.* at 419–20, 483 P.2d at 300–01.

We note, however, the "same source" requirement under *Templeton* was carried forward without discussion and was relied upon by the *Langenegger* court. The same source rule was not substantively revisited on the facts of *Langenegger* because the parties agreed that water in the artesian or deep basin contributed to the water in the shallow basin through upward leakage. Because the base flow of the river is the same water that is present in the shallow basin, and the artesian or deep aquifer contributes water to the shallow basin, the artesian aquifer is a "source," albeit minimal, of the water in which the applicant had surface rights. Obviously, under *Templeton* and *Langenegger,* failure to demonstrate upward leakage from the deep to the shallow aquifer would preclude supplemental wells reaching into the artesian or deep aquifer because the well would not capture

source water under the rationale of these two cases.

The *Templeton* doctrine was discussed most recently in *Brantley v. Carlsbad Irrigation District,* 92 N.M. 280, 587 P.2d 427 (1978). In *Brantley* the supreme court considered a trial court's reversal of an administrative action of the state engineer. The engineer had denied an applicant's request for permission to drill a supplemental well and the supreme court reinstated the denial. The applicant owned surface water rights, the water of which reached his property by means of a twenty-five-mile long canal. During transport over the length of the canal, certain determinable amounts were lost to seepage. The lost water seeped into the Pecos Valley Fill (shallow aquifer). The applicant sought to recapture the lost water and supplement his surface right by means of a well drilled into the Valley Fill or shallow aquifer. *Id.* at 281, 587 P.2d at 428.

Brantley sought to bring his application within the ruling in *Templeton* by claiming the water sought by the proposed well in the Valley Fill is the *same water* as that diverted at the head of the canal serving his property. Brantley thus took the literal position that he was following *his* water to its source. The court, relying on *Kelley,* construed *Templeton* narrowly and rejected Brantley's claim.

The court set out two binding constructions of the *Templeton* doctrine. First, there must be a showing that the supplemental well is located *above* the point of surface diversion on the stream system. Second, the water sought by an applicant's supplemental well must be demonstrated to be a "source of the surface waters in which they have rights." *Brantley,* 92 N.M. at 282, 587 P.2d at 429. The *Brantley* court determined neither condition was demonstrated below. The court concluded there was "no evidence that the ground water under Brantley's farm is a source of the surface flow of the Pecos at Avalon Dam." *Id.* (Avalon dam is the diversion point for the main canal.) This language clarifies and contracts the applicability of the "same source" language appearing in *Templeton.*

The water sought by the supplemental well must not only be the "same source" as the surface water, but it must also have been a source of the surface flow *at the point of surface diversion. Brantley,* 92 N.M. at 282, 587 P.2d at 429.

■ The correlative hydrogeology to this legal point was described by the *Brantley* court as well:

There is even evidence that the particular area of the valley fill where Brantley's surface water is lost is separated from where he seeks to drill by an impermeable underground geologic formation. If correct, this evidence would indicate that there is no connection at all between his lost water and the water he seeks by this application.

*Id.* at 282, 587 P.2d at 429. This dicta explains the *Brantley* holding, distinguishes *Templeton* and to some extent limits *Langenegger.* The *Templeton* doctrine may not be relied upon if the surface flow in which the surface appropriator has rights and to which the groundwater sought is supplemental is not in *direct hydrogeologic* connection with the underground water source.

Direct hydrogeologic connection exists in *Templeton* and does not exist where an impermeable geological formation separates the source of the surface flow at the point of surface diversion from the source of the water sought by the supplemental wells. *Brantley.* This limits *Langenegger* as well because the right to drill a supplemental well into the deep aquifer in that case arose because the deep aquifer contributed to the shallow aquifer through upward leakage and thereby contributed to the base flow. However, after *Brantley,* if an applicant seeks permission to drill into the deep aquifer under the *Langenegger* rationale, the upward leakage must be demonstrated not to simply contribute to the shallow aquifer, but the upward leakage must itself be shown to contribute to the shallow aquifer in such a way that it contributes to the surface flows at the point of surface diversion. *See generally,* George E. Welder, *Geohydrologic Framework of the Roswell Groundwater Basin,*

*Chaves and Eddy Counties, New Mexico,* Technical Report # 42, New Mexico State Engineer (1983) (leakage gradients in Roswell Basin reversed in some areas due to heavy groundwater pumping; leakage may flow from shallow to deep aquifer rather than from deep to shallow).

■ We conclude that the *Brantley* court continued the trend in the cases interpreting *Templeton* and concluded the movement away from the expansive hydrogeological dicta of *Templeton* by providing a clear holding that the water captured by a supplemental well must be a source of the surface flow at the point of surface diversion. *Templeton; City of Albuquerque; Langenegger; Brantley.* We now turn to the argument and evidence offered in connection with the state's motion for summary judgment.

The affidavit of Atkins relied upon by the City to controvert the state's motion for summary judgment claims that the "aquifer in the Rio Hondo Watershed is a continuous groundwater aquifer under water table conditions in most of the area from near the top of the watershed in the mountains to the west to the area near Roswell, where the water table becomes confined under artesian conditions." The affidavit also stated in part:

There are a number of areas in the Rio Hondo Watershed where the surface stream is "perched" above the groundwater aquifer, and thus groundwater does not contribute directly to the surface flow at the point of diversion. This is true in the Fort Stanton area, in a number of other areas along the river, and at the point of diversion for the Parker–Townsend Ranch.

The state filed an affidavit by Richard Hirsch and Maryann Wasiolek which referred to each statement contained in Atkins' affidavit.

The Hirsch–Wasiolek affidavit specifically referred to the portion of Atkins' affidavit quoted above, and stated:

This is a correct statement of fact and is the reason that the Templeton Doctrine does not apply in this case. When the

stream bed is at an elevation greater than the elevation of the local water table, as in the case here, groundwater from that system can not contribute directly or indirectly to the river at or above the point of diversion.

Although the affidavits relied upon by the parties conflicted in several areas, we think the portions referred to above and upon which the parties were in agreement are dispositive of the question of whether the City has adequately rebutted the state's prima facie showing of entitlement to summary judgment. *See Jelso v. World Balloon Corp.*, 97 N.M. 164, 637 P.2d 846 (Ct.App.1981) (where material facts relied upon by both parties are not in dispute but only the legal effect of the facts, summary judgment is proper). We conclude that the trial court properly awarded summary judgment herein.

The City admits on appeal that the water captured by wells RA–2887 and RA–2888 is not a source of water at the surface point of diversion for the antecedent surface rights. The City also admits that the aquifer into which wells RA–2887 and RA–2888 are drilled is separated from the river bed where the surface water rights obtain by several hundred feet of unsaturated sediments.

As previously discussed, in order to withstand the state's motion for summary judgment the City was required to establish the existence of material facts indicating that the water pumped from its supplemental wells was derived not only from the same source as the surface water available at its point of surface diversion, but it also must show that such water is derived from the same source as the surface flow at the point of surface diversion. The affidavit relied upon by the City fails to make this requisite showing.

*Conclusion*

■ A supplemental well priority date may properly "relate back" to the priority date of the antecedent surface right to which it is supplemental only upon a showing of the *Templeton* factual predicates. The factual show'ng must demonstrate

that the water sought or captured by the supplemental well is water that would otherwise reach the main channel of the surface source and that such water is a source of flow at the point of surface diversion. We affirm the order granting summary judgment against the City.

IT IS SO ORDERED.

DONNELLY and MINZNER, JJ., concur.