2004-NMCA-062

92 P.3d 31

**Ellis B. and Laverne HERRINGTON, Applicants–Appellants,**

v.

**STATE of New Mexico ex rel. OFFICE OF the STATE ENGINEER, Agency–Appellee.**

No. 23,871.

Court of Appeals of New Mexico.

April 2, 2004.

Certiorari Granted, No. 28,628, May 17, 2004.

Charles T. DuMars, Christina Bruff Du-Mars, Law & Resource Planning Associates, P.C., Albuquerque, NM, for Appellants.

DL Sanders, General Counsel, Stacey J. Goodwin, Special Assistant Attorney General, Santa Fe, NM, for Appellee.

*OPINION*

PICKARD, Judge.

{1} The Herringtons (Applicants) applied to change the point of diversion for their surface water right from an above-ground location to a well. The Office of the State Engineer denied their application, and Applicants appealed to the district court. The district court reviewed the application de novo and denied it, and Applicants appeal. Applicants argue that the district court (1) misapplied the case law governing when such transfers are permissible, (2) erred in failing to find that they had a right to change their point of diversion to a ground water well inherent to their water right, (3) incorrectly determined whether the proposed well would impair existing water rights, (4) erred in failing to grant a permit for a more shallow well, (5) ignored and contradicted binding provisions of an earlier adjudication, (6) did not have sufficient evidence to support the judgment, and (7) improperly considered expert testimony. We hold that the district court correctly applied the law and was not required to address impairment or grant a permit for a well with different specifications. We also hold that provisions of the earlier adjudication did not contradict the trial court's decision and that substantial evidence supported it. Accordingly, we affirm.

## FACTS AND PROCEEDINGS

{2} Applicants own a right to divert 49.73 acre-feet of water per year from the Rio de Arenas, a tributary of the Mimbres River in southern New Mexico, based on the adjudicated right to take 2.7 acre-feet per year per acre on their 18.42 acres of land. Applicants' historical point of diversion was the Frazier–Bateman Ditch.

{3} In 1982, Applicants filed an application to change their point of diversion from the Frazier–Bateman Ditch to a 100–foot–deep well, arguing that ground water pumping by up-stream junior appropriators had diminished the surface water available at their existing point of diversion. The proposed well was downstream from the point of diversion on the Frazier–Bateman ditch. The Office of the State Engineer denied the application in 1983. Applicants sought a hearing in front of a hearing examiner from the Office of the State Engineer, and the hearing examiner denied their application in 2001. Applicants appealed to the district court, as provided for by NMSA 1978, § 72–7–1 (1971). The district court denied the application, and Applicants appeal from this order. Additional facts appear below as they pertain to the decision.

## DISCUSSION

**ISSUE ONE: The district court correctly interpreted and applied the *Templeton* doctrine.**

{4} Applicants argue that the district court incorrectly interpreted New Mexi-

co law governing ground water wells that are used to compensate for a surface water shortage. We review the question of whether the district court properly interpreted the applicable law de novo. *See Gallegos v. N.M. Bd. of Educ.*, 1997–NMCA–040, ¶ 11, 123 N.M. 362, 940 P.2d 468 (holding that this court is "not bound by the conclusions of law reached by the trial court, and the applicable standard of review for such issues is de novo").

{5} New Mexico law recognizes that an individual with a surface water right may change his or her point of diversion to a well that supplements surface flows at times of shortfall, as long as two conditions are met. *Templeton v. Pecos Valley Artesian Conservancy Dist.*, 65 N.M. 59, 68, 332 P.2d 465, 471 (1958). First, the ground water to be pumped must be the source of the surface water. *Id.* Second, the change in point of diversion must not impair other existing water rights. *Id.* Surface water right owners may use this *"Templeton doctrine"* to acquire the full amount of their appropriation by tapping into ground water sources, even when the ground water basin has been closed to further new appropriation. *Id.* at 68–69, 332 P.2d at 471. In addition, the ground water well takes on the priority date of the surface water appropriation. *See State ex rel. Martinez v. City of Roswell*, 114 N.M. 581, 584–85, 844 P.2d 831, 834–35 (Ct.App. 1992) (hereinafter *Roswell* ).

{6} In *Templeton*, the ground water at issue was part of the Roswell Shallow Water Basin, and it flowed through soils known as the "Valley Fill." *Templeton*, 65 N.M. at 62, 332 P.2d at 466. At certain places and in times of flood, the Shallow Basin water level would rise to create an above-ground stream known as the Rio Felix. *Id.* The applicants in *Templeton* had surface water rights to the Rio Felix, but as ground water pumping in the area increased, the amount of water flowing to the surface to form the Rio Felix decreased. *Id.* at 62, 332 P.2d at 467. The applicants sought to tap into the Roswell Shallow Water Basin to obtain the full amount of their appropriation. *Id.* at 61, 332 P.2d at 466. The Court permitted this because the applicants merely sought to "follow

the source of their original appropriation." *Id.* at 68, 332 P.2d at 471.

{7} Our Supreme Court later clarified that ground water does not have to be the immediate source of surface water in order to meet the requirements of *Templeton*. In *Langenegger v. Carlsbad Irrigation District*, 82 N.M. 416, 417, 483 P.2d 297, 298 (1971), the applicants had a right to surface water from the Pecos River, and they proposed to tap the Roswell Artesian Basin to meet their shortfall. The Office of the State Engineer argued that because the Pecos River and the Roswell Artesian Basin were physically separated by the Roswell Shallow Water Basin, the Artesian Basin was not the immediate source of the surface water. *Id.* at 420–21, 483 P.2d at 301–02. However, evidence at trial had established that there was leakage from the Artesian Basin up to the Shallow Basin and that pumping from the Artesian Basin had diminished the supply of surface water. *Id.* at 418, 483 P.2d at 299. The Court held that because the Artesian Basin was a source of the Pecos·River at the location where the ground water well was proposed, the requirements of *Templeton* were satisfied. *Id.* at 421–22, 483 P.2d at 302–03.

{8} The *Templeton* source requirement was also refined in *Kelley v. Carlsbad Irrigation District*, 76 N.M. 466, 468, 415 P.2d 849, 850 (1966), which involved an applicant with a right to surface water from the Hondo River. The applicant sought to divert his water into the Hondo Reservoir, which he had not used previously. *Id.* at 469, 415 P.2d at 851. He then planned to drill a well to pump ground water from the Roswell Artesian Basin, arguing that the water from the Reservoir percolated into the Artesian Basin as a result of the Reservoir's highly permeable floor. *Id.* The Court held that unlike the ground water in *Templeton* that came above ground to become surface water, this was surface water that had sunk below the ground to become ground water. *Id.* at 472, 415 P.2d at 853. Consequently, the *Templeton* doctrine did not apply because the Roswell Artesian Basin at this location was not a source of the surface water to which the applicant had a right. *Id.*

{9} Similarly, in *Brantley v. Carlsbad Irrigation District*, 92 N.M. 280, 281, 587 P.2d 427, 428 (1978), the applicant had a surface water right to 3 acre-feet per year of water from the Pecos River. He argued that he was only receiving 2.1 acre-feet per year because of the inefficiency of the irrigation canal that conveyed the water to his property. *Id.* He applied for a ground water well to pump water from the Pecos Valley Fill, 25 miles downstream from his surface point of diversion. *Id.* at 282, 587 P.2d at 429. The Court held that this was impermissible because at this downstream pumping point, the ground water was not a source of the surface water to which he had a right. Quite the opposite, the surface water was actually the source of the ground water at the point he sought to drill, as it had seeped into the Valley Fill from the irrigation canal. *Id.* Furthermore, there was evidence that an impermeable geologic formation separated the area where the surface water seeped underground from the area where the applicant sought to drill. *Id.* The application could not be granted.

{10} *Roswell* accurately summarized these precedents and stated what an applicant must prove in order to invoke *Templeton:*

First, there must be a showing that the supplemental well is located *above* the point of surface diversion on the stream system. Second, the water sought by an applicant's supplemental well must be demonstrated to be a source of the surface waters in which [he or she has] rights.

*Roswell,* 114 N.M. at 587, 844 P.2d at 837 (internal quotation marks and citation omitted).

{11} Although our cases have stated that *Templeton* and its progeny created a "same source requirement," *id.* at 587, 844 P.2d at 837, that term is imprecise. The phrase "same source requirement" suggests that the applicant need only establish that the ground water sought is from the same source as the surface water to which the applicant has a right. To be *Templeton* water, however, the ground water must be "a source of the surface flow at the point of surface diversion." *Id.* at 588, 844 P.2d at 838 (emphasis omitted). As we stated in *Roswell, Templeton* water "is water that otherwise would have reached the main channel and become a source of the surface flow in which the surface appropriator has rights." *Id.* at 585, 844 P.2d at 835.

{12} In the present case, the *Templeton* doctrine was central to Applicants' success. They argued that *Templeton* governed their application because they met the source requirement and that under *Templeton* they were entitled to pump the ground water as long as it would not impair other existing rights. The district court disagreed, finding that *Templeton* did not apply because the water Applicants sought was downstream from the surface point of diversion and did not meet the source requirement.

{13} Applicants first argue that the fact that their proposed well is downstream from the surface point of diversion is not dispositive. They state that "the *Brantley* Court did not hold that a well which was slightly downstream of the original point of diversion but drawing from the same original source must be denied." This argument is indicative of the confusion that the "same source" terminology engenders. The issue is not whether the well draws from the same source that feeds the surface water body, but whether the water drawn from the well would have reached the surface water point of diversion to become a source of the appropriated waters. *See Kelley,* 76 N.M. at 472, 415 P.2d at 853. As a matter of logic, a downstream well cannot meet that requirement. A downstream ground water well necessarily draws on seepage and percolation that occurs after, i.e., downstream from, the surface water diversion. That seepage and percolation could not have been a source of the surface water to which the applicant has a right, and, as in *Brantley* and *Kelley,* it is more likely that the surface water is the source of the ground water at that location. Accordingly, we reaffirm the reasoning and holding of *Roswell* as the proper statement of *Templeton's* requirements.

{14} Additionally, the downstream location of the well was not the sole factor that the district court considered in the present case. It made three conclusions of law with respect to the *Templeton* doctrine:

6. Water obtained from a supplemental well at the proposed moved to location south of the current point of diversion for [Applicants'] surface water right does not have the same source of surface flow as a well located at the moved from location. [citing *Roswell, Brantley,* and *Templeton* ]

. . . .

9. The proposed well sought by [Applicants] will be located downstream from the current point of diversion at the Frazier–Bateman Ditch and, therefore, this application is not governed by the principles announced in *Templeton,* supra.

10. The proposed well sought by [Applicants] goes into the deep bedrock aquifer and there is no evidence of an upward leakage from that aquifer that contributes to the flow of surface water at [Applicants'] current point of diversion on the Frazier–Bateman Ditch.

{15} These conclusions reflect a precise statement of the law. As discussed above, the district court was correct to conclude that application of the *Templeton* doctrine requires that the ground water be a source of the surface water to which Applicants had a right. It was correct to conclude that the proposed well's downstream location would preclude Applicants from meeting that requirement. It was also correct to state that in order to drill a well into the deep bedrock aquifer, Applicants would have to show that the deep aquifer was a source of the surface water as a result of upward leakage, as in *Langenegger.* Therefore, we affirm the trial court's interpretation of the law.

 {16} To the extent that Applicants argue that the New Mexico Constitution art. IV, § 34 bars the court from considering cases subsequent to their initial filing of the application in 1982, this is incorrect. First, we note that we do not ordinarily entertain arguments which, as here, are raised for the first time in the reply brief. *Azar v. Prudential Ins. Co. of Am.,* 2003–NMCA–062, ¶ 85, 133 N.M. 669, 68 P.3d 909. Second, this constitutional provision does not apply in this situation. *Brantley* and *City of Roswell* were decided after 1982, but these cases did not affect the rights or remedies of the parties, nor did they alter a rule of procedure or

evidence. *See* N.M. Const. art. IV, § 34. These cases clarify the *Templeton* doctrine and apply the doctrine to different factual scenarios without changing the fundamental notion that a surface water right owner has the right to change the point of diversion to a ground water well that draws on a source of the surface water to which he or she has a right.

**ISSUE TWO: Applicants did not have a right to change their point of diversion to a ground water well independent of the requirements of *Templeton*.**

 {17} Applicants argue that even if they failed to meet the requirements of *Templeton,* they have an independent right to change the point of diversion of their surface water right to a ground water well. They base this argument on the language in the case of *Clodfelter v. Reynolds,* 68 N.M. 61, 66, 358 P.2d 626, 630 (1961), in which our Supreme Court agreed with the Colorado courts' holdings establishing that "the right to change the point of diversion, or place of use, of water which has been obtained as a result of an appropriation, is one of the incidents of ownership." Applicants urge us to adopt the view that the *Templeton* source requirement only applies when the water right owner wishes to apply the priority date of his or her surface water right to the ground water well. The Office of the State Engineer argues. to the contrary that the *Templeton* source requirement applies to all surface to ground transfers and that it is only the specific facts of prior cases that have led to some cases appearing to omit a *Templeton* analysis. We are unpersuaded by Applicants' interpretation of the law.

{18} Only one of the cases on which Applicants rely for this proposition involved a change from a surface point of diversion to a ground water well. In *Clodfelter,* the Public Service Company had been diverting surface water to supply the City of Santa Fe. *Id.* at 63, 358 P.2d at 628. When drought diminished the water available from these sources, the Public Service Company applied to drill ground water wells. *Id.* Individuals protesting the application argued that there was no statutory authority for this type of change in

point of diversion. *Id.* at 65, 358 P.2d at 628–29. In making the statement cited above, the Court was explaining that the right to change a point of diversion was not a statutory right, but rather an inherent part of a water right. *Id.* at 66, 358 P.2d at 629–30. Whether the ground water sought was a source of the surface water to which the Public Service Company had a right was not at issue.

{19} None of the other cases on which Applicants rely addressed a surface to ground change. *City of Albuquerque v. Reynolds,* 71 N.M. 428, 438, 379 P.2d 73, 80 (1962), held that when pumping from the Rio Grande Underground Basin affects the surface flows of the Rio Grande, the Office of the State Engineer has the authority to consider the impact that the pumping would have on surface flows. *State ex rel. Reynolds v. Rio Rancho Estates, Inc.,* 95 N.M. 560, 561–62, 624 P.2d 502, 503–04 (1981), involved a request to change the location of an existing ground water well. *Reynolds v. City of Roswell,* 99 N.M. 84, 85–86, 654 P.2d 537, 538–39 (1982), involved an application to drill additional wells to supplement existing ground water wells. Some statements from these cases, when taken out of context, appear to suggest that the only consideration in granting a change of point of diversion is impairment. However, none of these cases raised the issue of whether a surface water right owner has the right to change his or her point of diversion to a ground water well without meeting the *Templeton* requirements, and so none of these cases can be cited to support that proposition. *See Padilla v. State Farm Mut. Auto. Ins. Co.,* 2003-NMSC-011, ¶¶ 3–6, 133 N.M. 661, 68 P.3d 901 (limiting the rule that "cases do not stand for propositions not considered" to cases in which an issue as a whole was not considered).

{20} Furthermore, *Kelley* makes clear that applicants seeking to change from surface to ground diversion must meet the requirements of *Templeton.* The *Kelley* Court wrote:

The water sought to be used from the well in this instance is not underground water which, if not intercepted, would reach and become a part of a natural stream, either on or beneath the surface, and which is thus governed and controlled by the constitution and statutes relative to appropriation and diversion of surface waters, as·in *Templeton v. Pecos Valley Artesian Conservancy Dist.,* 65 N.M. 59, 332 P.2d 465; *Public Service Company v. Reynolds,* 68 N.M. 54, 358 P.2d 621 [ (1960) ]; and *Clodfelter v. Reynolds,* 68 N.M. 61, 358 P.2d 626.

*Kelley,* 76 N.M. at 472, 415 P.2d at 853. In drawing this distinction, the Court clarified that those who meet the *Templeton* source requirement may pump ground water as part of their surface water appropriation, whereas those not meeting the *Templeton* source requirement can only pump ground water in accordance with regulations governing new ground water appropriations. *See Kelley,* 76 N.M. at 472–73, 415 P.2d at 853. In both *Public Service Co.,* 68 N.M. at 60, 358 P.2d at 625, and *Clodfelter,* 68 N.M. at 67, 358 P.2d at 630, the Court was careful to note that the applications did not request any new appropriation. The *Kelley* distinction, therefore, is in keeping with the district court's analysis in this case, as detailed in the previous section.

**ISSUE THREE: The district court did not need to reach the issue of impairment.**

{21} Applicants challenge the district court's findings that the proposed well would impair other water users in the basin. It is true that if the district court had found that the ground water sought was *Templeton* water, the next step in its analysis would have been to determine impairment. *Templeton,* 65 N.M. at 68, 332 P.2d at 471. However, the district court in this case found that the *Templeton* source requirement was not met. Therefore, the application failed as a request to change a surface water point of diversion.

{22} Presented with precisely the same situation, the Office of the State Engineer in *Kelley,* 76 N.M. at 472–73, 415 P.2d at 853, proceeded to treat the application as an application for a new appropriation of ground water. On appeal, the *Kelley* Court found that because the artesian basin at issue was closed to further appropriation by the State

Engineer, the application had to be denied. *Id.* at 473, 415 P.2d at 853–54. It further stated, "In view of our disposition of this case, we do not reach the question and we need not determine whether the finding of the State Engineer, that the granting of the application would impair existing rights, is correct or erroneous." *Id.* at 473, 415 P.2d at 854.

{23} In the present case, after the district court determined that *Templeton* did not apply, it construed the application as one for a new well, which it then denied because it found that the area of the proposed well "is closed to new appropriations by Order of the State Engineer." *See* Elaine Moore Hebard, *A Focus on a Binational Watershed with a View Toward Fostering a Cross–Border Dialogue*, 40 Nat. Resources J. 281, 310 (2000) (explaining that the Mimbres basin is fully appropriated); *cf. Stokes v. Morgan*, 101 N.M. 195, 199, 680 P.2d 335, 339 (1984) (explaining the Office of the State Engineer's method for developing criteria to administer a ground water basin). We do not understand Applicants to challenge the Office of the State Engineer's determination that the Mimbres Underground Water Basin is fully appropriated. Consequently, the trial court's decisions to treat the application as one seeking to drill a new well and to deny that application because the basin is closed are correct as a matter of law. Applicants' arguments to the effect that the district court should have granted a permit to pump ground water at a level of pumping that would not cause impairment fail because any new ground water appropriation application must be denied in a basin that is closed to further appropriation.

**ISSUE FOUR: The district court was not required to conform the application to the requirements of *Templeton*.**

{24} Applicants argue that the district court should have granted a 50–foot well, rather than the 100–foot well applied for, because it found that ground water from the shallow aquifer did meet the source requirements of *Templeton*. Applicants provide no authority for the proposition that the district court should or must diverge from an application to grant a permit for a more shallow well in order to enable Applicants to meet the *Templeton* requirements. We find no such authority, and we see nothing in the case law to support creation of such a requirement.

{25} When evaluating a water rights application, "the state engineer may, in his discretion, approve any application for a less amount of water or may vary the periods of annual use, and the permit to appropriate water shall be regarded as limited accordingly." NMSA 1978, § 72–5–6 (1985). However, this power is discretionary. Our case law only establishes that the Office of the State Engineer may impose conditions on an application to prevent impairment, not that the State Engineer is required to impose conditions to make a well permissible. *See State ex rel. Reynolds v. Rio Rancho Estates, Inc.*, 95 N.M. 560, 564, 624 P.2d 502, 506 (1981).

{26} We are not persuaded to impose a duty on the Office of the State Engineer to mold its response to an application to fit the law. To impose such a duty would conflict with our well established law stating that it is the burden of the applicant to show that the application should be granted. *See Cross v. Erickson*, 72 N.M. 73, 77, 380 P.2d 520, 522 (1963). Furthermore, such a requirement would create an unreasonable burden on the Office of the State Engineer. The Office of the State Engineer must factor the depth of the well into its required analysis of the impairment potential of the proposed well, and it determines the depth at which to run these calculations from an individual's application. It would create an unworkable situation to add uncertainty to this process by creating the possibility that some indeterminate depth of well may be considered during the course of a hearing or trial, especially in light of how difficult and "unenviable" the task of determining impairment already is. *See id.* at 76, 380 P.2d at 522. Accordingly, the district court did not err by failing to grant Applicants permission to drill a well to a depth of 50 feet.

**ISSUE FIVE: The district court findings were not inconsistent and res judicata is inapplicable.**

{27} Applicants argue that because the shallow aquifer is a source of the surface

waters of the Rio de Arenas, they met the *Templeton* requirements. First, Applicants attack the findings of fact as inconsistent, pointing out that the findings indicate that water from the shallow aquifer is a source of the surface flow, but then conclude that the proposed well did not meet the *Templeton* requirements. This argument is flawed. The assertion of inconsistency presupposes either that the proposed well would draw from the shallow aquifer or that the deep aquifer has upward leakage into the shallow aquifer. The district court rejected both of these propositions, holding that the proposed well would draw from the deep aquifer and that the deep aquifer did not have upward leakage into the shallow aquifer. We read the district court's findings regarding the shallow aquifer's connectivity to the surface flow as an attempt to reconcile evidence that Applicants had historically used shallow wells to irrigate in times of surface shortfall. The district court recognized that while water from the shallow aquifer does meet the *Templeton* source requirement, the waters sought in this application were from the deep aquifer that does not meet the *Templeton* source requirement. This is both internally consistent and consistent with *Langenegger*, 82 N.M. at 418, 483 P.2d at 299, in which the applicants successfully proved connectivity with the deep aquifer.

{28} Second, Applicants argue that the 1981 adjudication of their water right, which found connectivity between the shallow aquifer and the surface flow, has a res judicata effect on the current proceeding that mandates a decision in their favor. Initially, we note that Applicants did not formally argue the elements of res judicata or collateral estoppel. *See City of Sunland Park v. Macias*, 2003–NMCA–098, ¶ 10, 134 N.M. 216, 75 P.3d 816 (listing the elements of collateral estoppel). Also, Applicants did not specifically raise the issue until their reply brief. *See Azar*, 2003–NMCA–062, ¶ 85, 133 N.M. 669, 68 P.3d 909. However, even assuming that the res judicata argument was properly raised and argued and applies to this case, it has no effect on the outcome. Applicants' water right adjudication established only that the shallow aquifer and surface flows were connected. The district court made a finding

of fact to this effect. This finding in no way prevented the district court from also finding that the proposed 100–foot–deep well drew from a different source than those earlier wells, and it properly held that this well did not meet the *Templeton* requirements.

**ISSUE SIX: Sufficient evidence supported the decision of the district court.**

{29} Applicants raise a number of arguments pertaining to the nature of the evidence introduced below. Applicants contend that these are not sufficiency of evidence arguments. However, since we have already determined that the law was correctly applied, Applicants' arguments calling the evidence into question trigger a review to determine whether the evidence supports the findings. In reviewing for sufficiency of evidence, we resolve all disputes and indulge all reasonable inferences in support of the prevailing party. *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Id.* "This court neither weighs the evidence nor passes on the credibility of witnesses." *Fierro v. Murphy*, 85 N.M. 179, 180, 510 P.2d 112, 113 (Ct.App.1973).

{30} We do not address those arguments that pertain to the impairment determination, since any findings regarding impairment were not an essential component of the decision, as explained above. *Kelley*, 76 N.M. at 473, 415 P.2d at 854; *see also Downs v. Garay*, 106 N.M. 321, 323, 742 P.2d 533, 535 (Ct.App.1987) (holding that erroneous findings of fact not necessary to support the judgment of the court are not grounds for reversal). The same is true for Applicants' arguments regarding the validity of the draw down calculation methodology used by the Office of the State Engineer's expert. We only review those factual determinations necessary to reach the district court's decision that *Templeton* did not apply, and we find them supported by sufficient evidence.

{31} The findings of fact that support the trial court's determination that the applica-

tion did not meet the *Templeton* require-
ments are:

31. A well [100 feet] deep will not cap-
ture the water that would be available to
[Applicants] as surface water, or surface
water that has seeped into the ground,
because the depth of the well will extend
into the deep bedrock aquifer which does
not contribute to the flow of Rio de Are-
nas.

. . . .

33. The 100 feet deep well proposed by
[Applicants] will not capture water which
is from the same source as the surface
water, and it will not capture surface water
at the current point of diversion.

{32} In support of these findings, the dis-
trict court received the testimony of Office of
the State Engineer hydrologist Susan
Hoines. Based on definitive studies of the
hydrogeology of the area, Ms. Hoines stated
that a 100–foot–deep well would result in
pumping from the deep bedrock aquifer. In
a memorandum submitted into evidence, she
stated that water from this depth "does not
discharge into the Rio de Arenas." Because
the studies indicated that the Rio de Arenas
loses water along its course, Ms. Hoines also
concluded that a downstream well would not
capture water that would have reached the
Applicants' surface water point of diversion.
The trial court also received memoranda
from R.E. Babcock, a water resource special-
ist at the Office of the State Engineer, and
D.L. Hathaway, another Office of the State
Engineer employee, stating the same opin-
ion.

{33} Furthermore, Applicants' own evi-
dence contributed to the district court's find-
ings. An affidavit from Alta Cloudt, Appli-
cants' predecessor in interest, stated that
"shallow wells were not adequate for irriga-
tion," supporting the finding that a well
would have to tap into the deep aquifer to
meet Applicants' needs. The Cloudt affidavit
also confirmed that the stream "only runs
during floods," supporting the Office of the
State Engineer's contention that the Rio de
Arenas is an ephemeral stream. While Ap-
plicants also presented some evidence that
contradicted that of the Office of the State
Engineer, the district court, which heard

lengthy testimony and reviewed voluminous
reports, photographs, models, and other evi-
dence, was in the best position to evaluate
and weigh the evidence, and we do not re-
weigh that evidence here.

{34} In addition, we note that Applicants
repeatedly assert on appeal that there is no
impermeable layer between the deep and
shallow aquifers. This directly contradicts
the district court's finding that there is no
leakage from the deep to the shallow aquifer.
However, even if there is no impermeable
separation, the district court concluded that
there was no evidence of upward leakage
from the deep aquifer that contributed to the
flow of surface water at the current point of
diversion. Applicants have not provided us
with citation to the record to the contrary,
and we will not comb the record to find
evidence that supports Applicants' position.
*See In re Estate of Heeter,* 113 N.M. 691,
694, 831 P.2d 990, 993 (Ct.App.1992). Thus,
we hold that the district court heard ample
evidence to support its conclusion that the
proposed well would tap into a deep aquifer
that was not the source of the surface water
to which Applicants have a right.

**ISSUE SEVEN: The district court proper-
ly relied on the testimony of the Office of
the State Engineer's expert.**

{35} Applicants argue that "[t]o the
degree that the [district court] relied upon
the testimony of the State's Expert witness,
the decision must be reversed, because it
[was] not based upon any valid hydrologic
facts and is admittedly the result of an inten-
tional attempt to prove a result, irrespective
of the true facts." Although the bulk of
Applicants' arguments in this area pertain to
the impairment calculation, which we do not
review, Applicants also challenge the expert
witness's testimony that contributed to the
*Templeton* determination. We understand
Applicants to argue that the Office of the
State Engineer's expert's testimony was not
based on acceptable methodology and that
she was biased.

{36} As to the allegations regarding the
expert's methodology, there are standards
governing the admissibility of scientific ex-
pert testimony. Rule 11–702 NMRA 2004;

*State v. Alberico,* 116 N.M. 156, 166–68, 861 P.2d 192, 202–04 (1993). However, Applicants concede that Ms. Hoines' testimony was admissible as scientific expert testimony. According to their brief, "[t]he Appellants are not arguing the evidence was not admissible, but rather that even though it was admitted, it should have been rejected by the District Court." Under these circumstances, the issues that Applicants raise go to the weight and credibility of the expert testimony, which we do not revisit. *See Baerwald v. Flores,* 1997–NMCA–002, ¶ 24, 122 N.M. 679, 930 P.2d 816. The same is true for any alleged bias that Ms. Hoines may have harbored. Applicants had ample opportunity to cross-examine Ms. Hoines and expose any bias or shortcoming in her experience or methodology to the district court.

## CONCLUSION

{37} We affirm the district court's denial of Applicants' application for a change in point of diversion for their surface water right.

{38} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Chief Judge and IRA ROBINSON, Judge.